**UNITED STATES, Appellee**

v.

**Private First Class Ronny L. CADE, Jr.,
United States Army, Appellant**

**ARMY 20140325**

U.S. Army Court of Criminal Appeals.

27 October 2016

Headquarters, III Corps and Fort Hood, Wade N. Faulkner, Military Judge, Lieutenant Colonel Erik L. Christiansen, Acting Staff Judge Advocate

For Appellant: Colonel Mary J. Bradley, JA; Major Christopher D. Coleman, JA; Captain Patrick J. Scudieri, JA (on brief).

For Appellee: Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major John K. Choike, JA; Captain Scott L. Goble, JA (on brief).

Before MULLIGAN, FEBBO, and WOLFE, Appellate Military Judges

## OPINION OF THE COURT

WOLFE, Judge

We address two issues in this appeal. First, we address appellant's assigned error that his counsel was ineffective at trial. Second, although not raised by appellant, we briefly address whether the offenses of rape and assault with intent to commit rape are multiplicious.

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of three specifications of rape, one specification of assault consummated by battery, and one specification of assault with intent to commit rape, in violation of Articles 120, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. 920, 928, 934 (2012) [hereinafter UCMJ]. After findings, the military judge found that the offense of assault consummated by battery was unreasonably multiplied with the assault with intent to commit rape specification and dismissed the former. The military judge also instructed the panel that all remaining offenses were to be treated as one for sentencing purposes. The court-martial sentenced appellant to a dishonorable discharge and confinement for five years. The convening authority approved the sentence as adjudged.

## BACKGROUND

On the night of 4 July 2013, appellant and LM arrived separately at a local nightclub in Killeen, Texas. Both were accompanied by some friends. At around 0200 on the morning of 5 July 2013, a fight broke out on the dance floor between the two groups. During the fight, someone pushed LM and she responded by hitting someone else with a bottle. That "someone" turned out to be appellant's brother. Although they arrived at the club independently, appellant and LM were friends. After the fight, appellant approached LM and they argued about what had happened in the club. A group formed around them and soon local police ordered the crowd to disband. In response to police threats that they would "mace or taze" everyone, LM left the club and drove herself home.

The government's chief witness was LM. She testified that soon after she arrived at her apartment, she received a series of phone calls and text messages from appellant. Appellant insisted on coming over to her house to finish the argument. LM told him she was tired and not to come. Appellant arrived anyway. When appellant entered the apartment, LM was asleep on the couch. She awoke to appellant entering the apartment while on the phone arguing with his wife. LM fell back asleep.

LM awoke to a burning and biting sensation in her genitals and saw appellant with his head between her legs. She punched him. In response, appellant bit her harder. Then began a physical struggle with appellant forcibly undressing LM, pinning her, and penetrating her vagina with his mouth, fingers and penis while LM struggled, hit, and scratched appellant. During the struggle appellant told LM that she had been "teasing him too long" that he'd been "wanting it" and that she "taste[d] good."

During a break in the assault, LM went into her bathroom and locked the door. Appellant stood outside the bathroom door and told her he was sorry. Eventually, LM heard her front door close. Not sure if appellant had actually left her apartment, LM remained in the bathroom and took a hot bath. After the bath, she finally exited the bathroom, determined that appellant was no longer in her apartment, found her phone and called 911. After first responders arrived LM was taken by ambulance to the local hospital where a sexual assault exam was performed. The exam detected some injury to her genitalia. A forensic examination would reveal DNA consistent with appellant's in her underwear.

The defense theory at trial was that appellant was not at the apartment and that LM had invented the assault as revenge for the physical altercation at the night club. The defense attempted to prove their theory by undermining the government's scientific evidence and calling two witnesses to establish an alibi. Specialist (SPC) Cason testified that after the fight in the club he rode in appel-

lant's car as appellant drove to LM's apartment. However, upon pulling up to the apartment, they saw a man coming down the stairs. Specialist Cason told appellant "he got a gun, he got a gun," so they drove off. Specialist Cason testified that he did not in fact see a gun, but told appellant there was a gun. Appellant then drove onto Fort Hood and dropped SPC Cason off in the barracks. Private First Class (PFC) David Stewart testified he was also at the club and saw a physical altercation between appellant and LM. Private First Class Stewart then went back to his house and fell asleep, but was awoken by appellant pounding on his door in an excited manner. He testified that he had never seen appellant act this excited before. Appellant told him that some of LM's friends were coming to PFC Stewart's house "to shoot the house up." The two soldiers then kept watch over a window but no one ever came. Private First Class Stewart could not give an exact time of when appellant came over to his house. Appellant did not testify in his own defense.

## LAW AND DISCUSSION

### A. Ineffective Assistance of Counsel

▮ On appeal, appellant asserts that this defense counsel at trial was ineffective. In support of this argument appellant asserts several mistakes that either individually or collectively constitute deficient performance.

1. Appellant first claims that his counsel was ineffective when he elicited facts during the cross-examination of LM that helped establish some elements to the charged offenses. In his affidavit, the defense counsel explains that in order to show the implausibility of LM's claims (regarding the sequence of events and positioning), and point out inconsistencies with her prior statements, he needed to ask specific questions. We do not find deficient performance or prejudice. Next, appellant asserts that his counsel was ineffective for not challenging the admission of a field (presumptive positive) test for semen taken from LM during the SANE exam. In his affidavit counsel explained that he specifically considered challenging the evidence at a *Daubert* hearing, but thought that such a course of action "would fail and only serve to motivate the Government to prepare the issue and preclude the effectiveness" of his cross-examination. We find this to be a valid tactical decision within the range of acceptable performance. Thirdly, appellant argues that it was per se ineffectiveness when his coun-

In response to appellant's claims, the government submitted a lengthy affidavit from appellant's trial defense counsel. Although appellant claims several errors that warrant reversal, we address in depth only one.[1]

We review these ineffective assistance of counsel claims de novo. *See United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012). To prevail, appellant "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted). An attorney is deficient when his representation falls "below an objective standard of reasonableness." *Id.*

Our superior court explained our inquiry as follows:

We do not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine whether counsel made an objectively reasonable choice in strategy from the available alternatives. Similarly, we must remain mindful that counsel have wide latitude in making tactical decisions. Thus, our scrutiny of a trial defense counsel's performance is highly deferential, and we make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.

sel specifically waived an instruction on "spillover." Counsel explained that because all the charges happened during one course of conduct and the defense theory was that none of it happened, he specifically did not want the panel members to focus on the individual offenses. The defense "strategy was to highlight the impossible nature of some of LM's claims, and argue that the panel should tie all the allegations together as equally improbable." That is, appellant's counsel wanted the unlikely nature of one offense to *spillover* into the government's proof of the other offenses. We again find this to be a valid tactical decision within the range of acceptable performance. Finally, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), appellant personally asserts that his counsel was ineffective in not adequately seeking discovery until three* days before trial. Appellant has failed to meet his burden of establishing that he was prejudiced by any deficient performance.

* Corrected

**928**

United States v. Akbar, 74 M.J. 364, 379 (C.A.A.F. 2015) (internal quotations, citations, end ellipses omitted).

Appellant argues that his counsel's failure to explain to his wife that she had the right to assert a spousal privilege was ineffective. Some additional background is necessary to explain this issue. When first interviewed by law enforcement, appellant stated that he could not have committed the offense because he was with his wife at the time. When agents called his wife the next day, she confirmed his alibi. At trial, however, the government called appellant's wife to testify that appellant was *not* with her all night. She also testified that appellant had asked her to lie to law enforcement.

The effect of this testimony was damning, especially given that appellant's defense rested in large part on the alibi testimony of two *other* friends of appellant. The military judge also gave the panel the "false exculpatory statement" instruction, which allowed them to infer consciousness of guilt from appellant's attempt to fabricate an alibi. Appellant argues that had his wife known she could assert the spousal privilege she would not have testified, and this prejudicial evidence would not have been put in front of the panel. Appellant points us towards *Carty v. Thaler*, for the proposition that the failure to inform a defendant's spouse of the marital privilege constitutes ineffective assistance. 583 F.3d 244, 259 (5th Cir. 2009) (finding deficient performance, but not prejudice).

We granted appellant's motion to attach an affidavit to the record of trial in support of his position. Unusually, however, the affidavit is not from appellant's wife. The affidavit is signed by an appellate attorney in the United States Army Defense Appellate Division.[2] In the affidavit, the affiant explains that she talked to appellant's wife. During this conversation, appellant's wife told the affiant that none of appellant's attorneys at trial had informed her of her right not to testify against her husband.

---

**2.** The affiant is not listed in the brief as counsel for appellant.

**3.** Our review of the factual and legal sufficiency of the evidence is even further limited, and includes only the evidence presented to the factfin-

## 1. The Record on Appeal

■ Before we can address the substance of appellant's assigned error, we must first determine whether we can consider appellant's submitted affidavit. The affidavit is, essentially, a declaration that the affiant heard someone else say something. The affiant does not claim to have any personal knowledge of any material fact, nor does she claim that what she heard is true. Accordingly, we first define with some precision what constitutes the record of trial on appeal.

■ As a starting place, "[i]t is inappropriate to base an appellate opinion on assertions dehors the record." *United States v. Matthews*, 68 M.J. 29, 41 (C.A.A.F. 2009) (citing *United States v. Crouch*, 566 F.2d 1311, 1316 (5th Cir. 1978) (internal ellipses omitted). That is, as a general rule, our appellate review is limited to the record of trial.[3] The President has defined the "contents" of the record of trial as: (1) the transcript; (2) the charge sheet(s); (3) the convening order(s); (4) any request for trial by judge alone; (5) the convening authority's action; (6) exhibits received into evidence; (7) and appellate exhibits. Rule for Court-Martial [hereinafter R.C.M.] 1103(b)(2). While other documents are "attached" to the record of trial (*see* R.C.M. 1103(b)(3)), strictly speaking, they are not part of the record of trial. Matters attached to the record of trial include the report of the Article 32, UCMJ, hearing officer, allied papers, exhibits marked but not admitted,[4] and post-trial submissions. Of course, matters normally attached to the record of trial may become part of the record of trial when they are offered at trial and litigated.

■ There are exceptions to this general rule. "[A]n appellate court can take judicial notice of law and fact under certain circumstances." *Paul*, 73 M.J. at 278. In reviewing the correctness of a convening authority's action, we routinely consider post-

---

der. *United States v. Paul*, 73 M.J. 274, 279 (C.A.A.F. 2014) (citation omitted).

**4.** We treat an exhibit which is offered but not admitted as an appellate exhibit.

trial documents, such as those created and submitted under R.C.M. 1105, 1105A, and 1106. However, when reviewing the adequacy of the trial itself, we are mostly limited to the record of trial. Exceptions generally fall into two categories. The first is when an appellant files a petition for a new trial under Article 73, UCMJ. An appellant may request a new trial based on new evidence not considered by the original trier of fact.[5] *See* R.C.M. 1210(f)(2). The second is a collateral attack[6] on the conviction, usually and as is the case here, in the form of an allegation of ineffective assistance of trial. To say, however, that a party may supplement the record with new substantive evidence does not end the inquiry. Such evidence must come in a manner which this court can *digest.* Generally, this requires the evidence to be either a sworn affidavit or a declaration made under penalty of perjury. *See United States v. Axtell*, 72 M.J. 662, 665 (Army Ct. Crim. App. 2013). For petitions for a new trial, affidavits are required. R.C.M. 1210(c)(8), (9).

Here, we have a sworn affidavit. However, the affiant does not claim to have personal knowledge of any of the facts contained within the affidavit. Rather, the affiant merely swears that a witness told her certain facts. The question we must answer is whether this is sufficient. The government implicitly argues that that we should not consider the affidavit. We determine that when submitting affidavits on appeal the affidavits must be from someone with personal knowledge of the material facts in the affidavit. Or, put differently, the person whose personal knowledge the court is being asked to rely on must be the person who is subject to perjury.

At trial, the affidavit submitted by appellant would clearly be inadmissible. Military Rule of Evidence [hereinafter Mil. R. Evid.] 602 ("Lack of personal knowledge"); and Mil. R. Evid. 802 (unless an exception applies, hearsay is inadmissible).

We view with caution allowing an appellate court to consider evidence that could not have been admitted at trial. To state an obvious example, a party may not ask us to consider for the first time on appeal privileged evidence for which no exception to the privilege applies. This would defeat both the purpose of the privilege and undermine the reason for the trial. "[A] trial on the merits, whether in a civil or criminal case, is the 'main event,' and not simply a 'tryout on the road' to appellate review." *Freytag v. Commissioner*, 501 U.S. 868, 895, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J. concurring) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

However, just because a document would be inadmissible at trial is not to say it cannot be considered on appeal. A Court of Criminal appeals is not a trial court. When reviewing claims of ineffective assistance of counsel or petitions for new trial, we do not sit as a factfinder. "Congress intended a Court of Criminal Appeals to act as factfinder in an appellate-review capacity and not in the first instance as a trial court." *United States v. Ginn*, 47 M.J. 236, 242 (C.A.A.F. 1997). The CAAF "has never held that Article 66(c), UCMJ, permits a Court of Criminal Appeals to exercise its factfinding power on conflicting post-trial affidavits and the record of trial." *Id.* at 243.

Given our limited role on appeal, and deciding only the narrow issue before us, we need not determine whether we should apply whole cloth the Military Rules of Evidence to new evidence submitted on appeal. However, we do determine that an affidavit submitted in support of a claim of ineffective assistance of counsel must be submitted by a person with knowledge of the relevant facts contained in the affidavit. Such a requirement aligns affidavits in support of claims of inef-

---

**5.** For example, in *United States v. Marcus*, we were faced with a dilemma. ARMY 20130795, 2016 WL 797092, 2016 CCA LEXIS 96 (Army Ct. Crim. App. 19 Feb. 2016), *pet. denied*, 75 M.J. 403 (C.A.A.F. 2016). The appellant presented us with affidavits that alleged facts outside the record of trial which he claimed constituted prosecutorial misconduct. In order to consider

evidence outside of the record of trial, we interpreted appellant's appeal as a petition for a new trial based on a fraud on the court-martial.

**6.** Technically speaking, as we address claims of ineffective assistance on direct appeal, claims of ineffective assistance are not "collateral."

fective assistance with the provisions governing petitions for new trial.

The President has prescribed rules regarding the submission of affidavits for a petition for a new trial. The appellant is required to support his or her petition with affidavits from witnesses who would testify at the new trial. R.C.M. 1210(c)(9). "Each such affidavit should set forth briefly the relevant facts within the *personal knowledge* of the witness"). *Id.* (emphasis added); *see also United States v. Zaiss*, 42 M.J. 586, 593 n.2 (Army Ct. Crim. App. 1995) ("The appellant also failed to have either of his two polygraph examiners comply with R.C.M. 1210(c)(9) and submit a sworn affidavit setting forth briefly the relevant facts within their personal knowledge. A signed statement is not the same as an affidavit."); *United States v. McElhaney*, 54 M.J. 120, 127 (C.A.A.F. 2000) ("The affidavit also established that Special Agent Joy had no personal knowledge . . . .").

 While the President has not explicitly adopted rules for submitting affidavits to support an allegation of ineffective assistance of counsel, such a requirement appears to exist in collateral claims of ineffective assistance in federal courts. *See* Federal Rule of Civil Procedure 56(e). Moreover, the requirement that the affiant have personal knowledge of the material facts asserted in the affidavit makes sense. Without such a requirement, an affiant can truthfully repeat the deliberate deceit of another. *See Rugendorf v. United States*, 376 U.S. 528, 532, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964) ("[T]he allegations in the affidavit . . . were of only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit."); *Paters v. United States*, 159 F.3d 1043, 1048 (7th Cir. 1998) ("Prewitt had absolutely no personal knowledge regarding the facts underlying his allegation. . . . . Therefore, his affidavit could not constitute evidence supporting his claim.").

Here, the affiant does not claim to have any personal knowledge relevant to the case. The personal knowledge of the affiant is that she spoke to appellant's spouse. Perhaps more accurately, as the affiant does not claim to personally know appellant's spouse, she spoke to someone who self-identified as appellant's spouse. In contrast, a notarized sworn statement or notarized affidavit from appellant's spouse would: 1) confirm the identity of the person making the statement; and 2) subject to perjury the person whose statement appellant is asking the court consider.

As we have no affidavit by a person with knowledge, appellant has not met his burden of establishing the facts necessary for this court to provide any relief.

### 2. Counsel Was Not Deficient

 To the extent that our requirement for an affidavit by someone with personal knowledge announces a new rule, we choose to address the merits of appellant's claim of ineffective assistance of counsel. For this purpose, we will assume that the sworn affidavit constituted a sworn statement from appellant's wife. That is, we assume we have a sworn statement from appellant's wife that: 1) she was not advised about the marital privilege; and 2) would have invoked the privilege if she had known it was available.

In response to the allegation of ineffective assistance, the government obtained two affidavits from appellant's trial defense team. Appellant's lead defense counsel swore that he had advised appellant's wife on numerous occasions of her privilege to refuse to testify. He stated that while he told her he could not provide her legal advice, "she could not be compelled to testify at the trial." He further advised her she could seek tailored legal advice from a legal assistance attorney. In the days before trial, counsel stated that he made sure appellant's wife "fully understood the ramifications of her potential testimony if she chose to cooperate with the government." He claims that appellant's wife "stated affirmatively that she wanted to testify," notwithstanding counsel's repeated pleas to the contrary. Accordingly, he concentrated his preparation on extracting as much favorable information as possible during cross-examination. The affidavit from co-counsel was not as compelling. Co-counsel stated that he never personally advised appellant or his wife regarding the marital privilege. However, he swore that he witnessed a conversation between the lead counsel and appellant's

wife where she stated she was "morally conflicted about lying" in her initial statement to law enforcement and that she wanted to testify to "come clean."

Given our assumption that we have a sworn affidavit from appellant's wife, this would present us with conflicting affidavits. Presented with conflicting affidavits, we are required to order a hearing pursuant to *United States v. DuBay*, 17 USCMA 147, 37 C.M.R. 411 (1967), unless the allegations are "speculative," are "palpably incredible," or where the record "compellingly demonstrates" the accuracy of one affidavit as opposed to the other. *Ginn*, 47 M.J. at 244. In this case, we find that the record does *compellingly* demonstrate the falsity of appellant's wife's claims.

At trial, appellant's counsel began his cross-examination by confirming that "you're currently married to PFC Cade?" She responded, "Yes." He then asked "And you understood ... you didn't have to testify today? She again answered "Yes." Thus, the evidence introduced at trial demonstrates that appellant's wife understood that she had a choice of whether to testify. Accordingly, a remand for a fact-finding hearing is unnecessary.

### B. Assault with Intent to Commit Rape is not a Lesser-Included Offense of Rape

■ Appellant was convicted of three specifications of rape. Each specification of rape alleged a separate penetrative act (by mouth, finger, and penis). Appellant was also convicted of assault with intent to commit rape for "pulling her shorts and underwear from her body with his hand, while pinning her arms down." It is beyond dispute that the "assault with intent to commit rape" was a precursor event that led to all three rapes. That is, appellant followed through on his intent to commit rape.

■ Though appellant assigns no error, we believe this warrants a brief discussion.[7]

■ Our superior court has described the difference between an attempt and an "assault with intent to ..." as "approach[ing] the metaphysical." *United States v. Weymouth*, 43 M.J. 329, 338 (C.A.A.F. 1995). This matters, because an attempt merges into the completed offense. One cannot be convicted of both an attempt and the completed offense. In *United States v. Hobbs*, the Court of Military Appeals discussed in detail the difference between an "attempt" and an "assault with intent to commit rape."

> Assault with intent to commit rape consists of an attempt or offer with unlawful force and violence to do bodily harm to another, accompanied by a specific intent to commit rape. When that crime is compared with the offense of attempted rape, it is at once apparent that the sexual intent is the same in both instances, and that the overt act required for the latter may well consist of an assault. Many courts have had difficulty distinguishing the two offenses, and there is authority that every assault with intent to rape is an attempt, but that the converse does not follow. An assault with intent to commit an offense is not necessarily the equivalent of an attempt to commit the intended offense. However sound this may be in the case of other intended offenses, it is difficult indeed to conjure up a hypothetical situation to support this where the intended offense is rape. It is at least safe to conclude that in almost all situations where the prosecution could charge and prove an assault with intent to commit rape, it could charge and prove attempted rape as well.

23 C.M.R. 157, 162 (C.M.A. 1957) (internal citations and quotations omitted).

---

7. Our discussion here is limited to whether the offenses are multiplicious. We have separately considered whether the offenses are unreasonably multiplied. At trial, appellant raised the issue of unreasonable multiplication of charges. The military judge denied the motion as to findings but instructed the panel to consider them as one for sentencing. Although we find it a close call, we cannot conclude that under *United States*

*v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001), the military judge abused his discretion. In conducting this analysis, we note especially that appellant does not object on appeal, either in his brief or under the matters he personally submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), that any of the offenses are unreasonably multiplied.

In *United States v. Britton*, 47 M.J. 195, 203 (C.A.A.F. 1997) the court stated that "assault with intent to commit rape and attempted rape are multiplicious, at least where the facts demonstrate a continuous course of conduct." Accordingly, since they are multiplicious, both attempted rape and assault with intent to commit rape would merge into the completed offense of rape. However, the CAAF later explicitly overruled both *Britton* and its logical underpinnings. *United States v. Miller*, 67 M.J. 385, 389 (C.A.A.F. 2009). In *Miller*, the court held that the enumerated articles could no longer be assumed to include the terminal elements in Article 134, UCMJ, clause (1) and (2). The court reiterated that the terminal elements of Article 134, UCMJ, offenses must be both alleged and proved. *Id.* Accordingly, neither the offense of assault with intent to commit rape nor the offense of attempted rape subsumes the other. The offenses are therefore not multiplicious.

## CONCLUSION

The findings and sentence are AF-FIRMED.

Senior Judge MULLIGAN and Judge FEBBO concur.