# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private First Class JOSEPH B. CAMPBELL**
**United States Army, Appellant**

ARMY 20140305

Headquarters, 1st Cavalry Division
Rebecca K. Connally, Military Judge
Colonel R. Tideman Penland, Jr., Staff Judge Advocate (pretrial)
Lieutenant Colonel Alison C. Martin, Staff Judge Advocate (post-trial)

For Appellant: Colonel Mary J. Bradley, JA; Major Christopher D. Coleman, JA; Captain Patrick J. Scudieri, JA (on brief).

For Appellee: Lieutenant Colonel A.G. Courie, III, JA; Major Melissa Dasgupta Smith, JA; Captain Christopher A. Clausen, JA (on brief).

23 January 2017

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FEBBO, Judge:

A military judge sitting as a special court-martial, convicted appellant, pursuant to his pleas, of one specification each of conspiracy to commit larceny of military property, larceny of military property, housebreaking, and concealing stolen property, in violation of Articles 81, 121, 130, and 134 Uniform Code of Military Justice, 10 U.S.C. §§ 881, 921, 930, 934 (2012) [hereinafter UCMJ]. The military judge sentenced appellant to a bad-conduct discharge and confinement for five months. In accordance with the pretrial agreement, the convening authority approved only three months of confinement but otherwise approved the sentence as adjudged.

This case is before the court for review under Article 66, UCMJ. Appellant raises two allegations of error to this court. In the first assignment of error

appellant asserts the military judge abused her discretion by accepting appellant's guilty plea to the conspiracy, larceny, and housebreaking charges. In the second assignment of error, appellant asserts that the government was dilatory in post-trial processing. Both assigned errors warrant discussion, and both merit at least partial relief.

## BACKGROUND

As part of the pretrial agreement, the parties stipulated to the relevant facts in the case. Appellant was assigned to the 3d Cavalry Regiment, 1st Cavalry Division, at Fort Hood, Texas. Appellant's primary occupational specialty (MOS) was 91C, Utilities Equipment Repair. The charged offenses arose from appellant and two other soldiers from his unit entering motor pools and motor pool bays on Fort Hood and stealing multiple items of military property.

On 4 October 2013, appellant and the two other soldiers "decided to break into unit motorpools[1] at night to take batteries to sell to a scrap and metal recycling center in exchange for cash." The three soldiers had previously stolen military property to sell. That evening, the three soldiers "traveled to a secluded motorpool" on Fort Hood. At the motor pool, the soldiers "entered through a fence" and "took approximately 20 large vehicle batteries." They also took tools and an air compressor. The next day, the three soldiers sold the batteries to a scrap and recycling center for cash and "split the money amongst themselves."

The three soldiers agreed to do the "same thing" the following weekend. On 11 October 2013, the three soldiers traveled to another motor pool on Fort Hood. After hiding their vehicles behind military vehicles, they "cut the lock off the gate and entered the motorpool in order to find batteries to steal." They entered the "motorpool bay" and took approximately thirty batteries. They selected the larger batteries "because they were worth more money." The three soldiers also took two sets of jumper cables for military vehicles and three toolboxes. The soldiers stripped the jumper cables down to "clean copper to sell to the scrap yard." Again the next day, the three soldiers sold the batteries to a scrap and recycling center for cash and split the money amongst themselves.

Afterward, the three soldiers disagreed on how they would split the money received from stolen property in the future. Appellant and one of the other soldiers decided to exclude the third soldier "the next time they stole property." On 12

---

[1] The charges and stipulation of fact reference "motorpool" and "motorpool bay." The court prefers the spelling "motor pool" and "motor pool bay" but has kept the original spelling for consistency when discussing and quoting the language in the charges, specifications, and stipulation of fact.

October 2013, appellant and one of the soldiers, went to "their own unit motorpool to steal batteries to sell." After again hiding their trucks, appellant and the other soldier cut the lock off the fence and "entered the motorpool bay." Together, they stole "approximately fifty (50) large vehicle batteries." The two soldiers took the batteries to a scrap and recycling center to sell.

As part of the stipulation of fact, appellant stipulated to the elements of the charged offenses contained in the specifications. The military judge advised appellant of the elements of conspiracy, larceny, housebreaking, and concealing stolen property offenses. Prior to accepting appellant's guilty plea, the military judge conducted a plea inquiry with the appellant.

## LAW AND DISCUSSION

We review a military judge's decision to accept a plea of guilty "for an abuse of discretion and questions of law arising from the guilty plea de novo." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008); *see also United States v. Murphy*, 74 M.J. 302, 305 (C.A.A.F. 2015); *United States v. Phillips*, 74 M.J. 20, 21-22 (C.A.A.F. 2015) ("Appellant bears the burden of establishing that the military judge abused [her] discretion."). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citing *United States v. Wallace*, 296 U.S. App. D.C. 93, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)). A guilty plea will be set aside on appeal only if an appellant can show a substantial basis in law or fact to question the plea. *Gore*, 60 M.J. at 187 (citing *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)). The court applies this "substantial basis" test by determining whether the record raises a substantial question about the factual basis of appellant's guilty plea or the law underpinning the plea. *Gore*, 60 M.J. at 187; *United States v. Barton*, 60 M.J. 62, 65 (C.A.A.F. 2004) ("a guilty plea is less likely to have developed facts."); *see also* UCMJ art. 45(a); Rule for Courts-Martial [hereinafter R.C.M.] 910(e).

A providence inquiry into a guilty plea must establish that the accused believes and admits he is guilty of the offense and the factual circumstances admitted by the accused objectively support the guilty plea. *United States v. Garcia*, 44 M.J. 496, 497-98 (C.A.A.F. 1996); *United States v. Davenport*, 9 M.J. 364, 367 (C.M.A. 1980); UCMJ art. 45(a); R.C.M. 910(e). The record of trial must reflect not only that the elements of each offense have been explained to the accused, but also "make clear the basis for a determination by the military trial judge . . . whether the acts or the omissions of the accused constitute the offense . . . to which he is pleading guilty." *United States v. Care*, 18 U.S.C.M.A. 535, 541, 40 C.M.R. 247, 253 (1969). The stipulation of fact can provide an additional factual basis upon which to satisfy this requirement. *Id.* "If an accused sets up matter inconsistent with the plea at any time during the proceeding, the military judge must

either resolve the apparent inconsistency or reject the plea." *United States v. Hines*, 73 M.J. 119, 124 (C.A.A.F. 2014) (quoting *United States v. Goodman*, 70 M.J. 396, 399 (C.A.A.F. 2011)) (internal quotation marks omitted); *see also* UCMJ art. 45(a). "A military judge abuses his discretion if he neglects or chooses not to resolve an inconsistency or reject the inconsistent or irregular pleading." *United States v. Schell*, 72 M.J. 339, 345 (C.A.A.F. 2013) (quoting *United States v. Hayes*, 70 M.J. 454, 457-58 (C.A.A.F. 2012)). The military judge need only reject the plea when the accused "persists in his statements" that cause the inconsistency. *United States v. Thompson,* 21 U.S.C.M.A. 526, 527, 45 C.M.R. 300, 301 (1972). Where the possibility of a defense exists, a military judge should secure satisfactory disclaimers by the accused of this defense. *Prater*, 32 M.J. at 436 (citing *United States v. Jemmings*, 1 M.J. 414, 418 (C.M.A. 1976)).

"In determining on appeal whether there is a substantial inconsistency, this [c]ourt considers the 'full context' of the plea inquiry, including [a]ppellant's stipulation of fact." *Goodman*, 70 M.J. at 399 (quoting *United States v. Smauley*, 42 M.J. 449, 452 (C.A.A.F. 1995)). "This court must find a 'substantial conflict between the plea and the accused's statements or other evidence' in order to set aside a guilty plea. The 'mere possibility' of a conflict is not sufficient." *Hines*, 73 M.J. at 124 (quoting *United States v. Watson*, 71 M.J. 54, 58 (C.A.A.F. 2012)); *United States v. Phillippe*, 63 M.J. 307, 309 (C.A.A.F. 2006).

## A. *The Conspiracy Charge*

On appeal, appellant contends that the military judge did not elicit sufficient facts to support that the conspiracy "was to commit not only a larceny but a larceny of military property greater than $500." As a result, "[W]ithout these two statutory sentencing enhancers, the maximum punishment would have been six months and a bad-conduct discharge as opposed to ten years and a dishonorable discharge."

The military judge went over the stipulation of fact with the appellant. The military judge also advised appellant of the elements of conspiracy to commit larceny which included larceny of military property of a value over $500. However, the military judge never explicitly elicited from appellant whether the criminal agreement at inception included an agreement to steal more than $500 of military property. Appellant described to the military judge that after the initial agreement on 4 October 2013, he remained party to the conspiracy and never attempted to withdraw from the conspiracy or abandon the plan to steal military property from motor pools.

The stipulation of fact established that prior to entering into the agreement on 4 October 2013 appellant and the other two soldiers had previously "stolen military property to sell." As a result, they would have generally known and understood the value of the additional military property they planned to steal. Based on his duty

4

location and assigned unit, appellant understood the items stored within a motor pool bay were military property which belonged to the government.

On 4 October 2013, as part of the conspiracy, appellant and the other two soldiers drove their vehicles to the motor pools to haul away the items they sold to scrap and metal recycling centers. Appellant and the other soldiers entered a motor pool and stole twenty large batteries, tools, and an air compressor. Appellant and the other soldiers hauled these items of military property to the scrap and metal recycling centers and sold the items knowing they were military property. After 4 October 2013, appellant criminal conspiracy continued after the initial agreement and they agreed do the "same thing" the following weekend as described earlier.

Overall, during the course of their conspiracy, appellant and his counterparts cut gate locks, entered motor pools and motor pool bays, and stole approximately 100 "large" batteries, tools, three tool boxes, air compressors, and two sets of jumper cables. Appellant and the other soldiers stripped the cables "down to clean copper" to sell the cables to scrap and metal recycling centers. Appellant and the other soldiers sold the batteries alone for approximately $6,000, an amount far in excess of $500 and 1200% above the legal threshold for increased punishment.

Appellant's statements during the providence inquiry for larceny, supplemented by the stipulation of fact, established that he understood the value of the items that they conspired to steal was over $500 and were in fact military property. During the providence inquiry for the larceny charge, which was the object of the conspiracy, the military judge explicitly elicited from appellant that he knew the property stolen was more than $500 in value and was military property.

The conspiracy specification alleged all the elements of the offense charged, appellant pleaded guilty to the specification, the providence inquiry established that the appellant believed he was guilty, and the factual circumstances revealed by the appellant objectively support the guilty plea. Having examined the "full context" of the plea inquiry, to include appellant's responses during the entire colloquy to the larceny charge, and the stipulation of fact, and appellant's sentencing case, we find no substantial basis to question his plea of guilty. Therefore, the appellant's plea to the Specification of Charge I was provident.

As the appellant has shown no substantial basis in law or fact to question his pleas of guilty, we conclude that the military judge did not abuse her discretion in accepting appellant's pleas. *See Inabinette*, 66 M.J. at 322.

## B. The Larceny Charge

Appellant contends that the military judge abused her discretion in finding appellant provident to the larceny charge. Appellant states that the stipulation of

fact was separated into three separate larcenies while appellant pleaded guilty to one larceny "event" consisting of all the stolen items (batteries, tool boxes, air compressors and jumper cables).  Appellant contends that it was error for him to plead guilty to stealing specific items of military property during one transaction while he stipulated to different items during different times.

It is correct the stipulation of fact was broken into three paragraphs that addressed the factual bases for three separate larcenies (on or about 4 October 2013, 11 October 2013, and 12 October 2013).  It is also correct that the single charge covered all the items of U.S. Army property stolen between on or about 4 October 2013 to 17 October 2013.  Normally, this court is confronted with the opposite criticism about the government's charging decision.  If the government had charged all three larcenies separately, it may have prompted a claim of unreasonable multiplication of charges.[2]

Instead, we now address whether the charges were duplicitous. "One specification should not allege more than one offense."  R.C.M. 307(c)(3) discussion (G)(iv).  However, if two acts or a series of acts constitutes one offense, they may be alleged conjunctively. *Id.*  The remedy for a duplicitous specification is to file a motion to sever the specifications into two or more specifications.  R.C.M. 906(b)(5).  Prior to entering his guilty plea, appellant never raised to the trial court any objections to the larceny charge as drafted or objections to the wording of the stipulation of fact.  "An unconditional guilty plea generally waives all pre-trial and trial defects that are not jurisdictional nor a deprivation of due process of law." *United States v. Schweitzer*, 68 M.J. 133, 136 (C.A.A.F. 2009) (quoting *United States v. Rehorn*, 9 U.S.C.M.A. 487, 488-89, 26 C.M.R. 267, 268-69 (1958).  We do not find any error or prejudice in how the government drafted the larceny charge.

---

[2] *See, e.g.,* the explanatory text of Article 121 in the Manual of Courts-Martial provides guidance on what the government should consider when charging a "multiple article larceny":

> When a larceny of several articles is committed at substantially the same time and place, it is a single larceny even though the articles belong to different persons. Thus, if a thief steals a suitcase containing the property of several persons or goes into a room and takes property belonging to various persons, there is but one larceny, which should alleged in but one specification.

*Manual for Courts-Martial*, *United States* (2012 ed.) [hereinafter *MCM*], Part IV, para. 46(c)(i) (ii)

Not severing the specification into three larcenies was not prejudicial to appellant.[3] Regardless, reviewing the full context of the plea inquiry, to include appellant's responses during the entire colloquy to the larceny charge, the stipulation of fact, and appellant's sentencing case, we find no substantial basis to question his plea of guilty. The military judge did not find any inconsistencies between the charged and admitted conduct and his guilty plea inquiry, and neither do we.

We find the appellant's plea inquiry adequately established he was guilty of the larceny charge. Both in the stipulation of fact and the plea inquiry, appellant established he stole U.S. Army property on three different dates. Appellant's providence inquiry established he was guilty of stealing batteries, tool boxes, air compressors, and jumper cables that were the property of the U.S. Army. Appellant informed the military judge he worked in the motor pool, maintained vehicles, and knew the items were military property that belonged to the U.S. government. In fact, appellant used the tools, batteries, and jumper cables at the motor pool to maintain the vehicles.

The specification alleged all the elements of the offense charged, the appellant pleaded guilty to the specification of larceny of military property of a value more than $500, the providence inquiry established that the appellant believed he was guilty, and the factual circumstances revealed by the appellant objectively support the guilty plea. Therefore, the appellant's plea to the Specification of Charge II was provident.

As the appellant has shown no substantial basis in law or fact to question his pleas of guilty, we conclude that the military judge did not abuse her discretion in accepting appellant's plea to the larceny charge. *See Inabinette*, 66 M.J. at 322.

*C. The Housebreaking Charge*

Appellant contends that the military judge abused her discretion in accepting appellant's plea to the Article 130, UCMJ, housebreaking charge because he never stated he unlawfully entered a structure. In appellant's case, the housebreaking charge included an unlawful entry into both a "motorpool" *and* "motorpool bay" with the intent to commit a larceny. Article 130, UCMJ, provides: "Any person subject to this chapter who unlawfully enters the building or structure of another with intent to commit a criminal offense therein is guilty of housebreaking . . . ." *MCM*, Part IV, para. 56c(4), discusses the offense of housebreaking:

'Building' includes a room, shop, store, office, or apartment in a

---

[3] The same analysis would apply to an argument that the housebreaking charge was duplicitous and should have been severed into three separate specifications.

building. 'Structure' refers only to those structures which are in the nature of a building or dwelling. Examples of these structures are a stateroom, hold, or other compartment of a vessel, an inhabitable trailer, an in-closed truck or freight car, a tent, and a houseboat. . . .

Our superior court recently decided the question of whether a motor pool can be the subject of an Article 130, UCMJ, housebreaking charge. *United States v. Wilson*, 76 M.J. ___ (C.A.A.F. 2017). The CAAF concluded a fenced motor pool is not a structure for housebreaking purposes. *Id*. at *2. The Court of Appeals for the Armed Forces (CAAF) did aver that a motor pool bay can constitute a structure for housebreaking purposes: "Neither are [fenced motor pools] 'permanent structures,' as the fences can be easily moved or removed, unlike a motor pool bay." *Id*. at *6. We will modify appellant's housebreaking charge accordingly by excepting the words "a motor pool and" in our decretal paragraph. We hold the military judge did elicit the factual predicate to rightly conclude that a "motor pool bay" in appellant's case is a building structure for housebreaking purposes. We include definition and discussion of "motor pool" to delineate the term from "motor pool bay," which we also discuss in-depth.

A motor pool[4] is a customary military term used to describe an area, normally fenced, where military vehicles and equipment are stored, accounted for, and maintained.[5] A motor pool can include buildings and structures contained within the perimeter or gated area of the motor pool. A "bay" is a customary military term that the Army uses to describe open areas contained within buildings that are used for

---

[4] Dep't of the Army, Pam. 750-3, Soldier's Guide to Field Maintenance Operations, para. 5-9 (18 Sept. 2013) (discusses motor pool safety, standard operating procedures (SOPs), security, and maintenance. For example, under para. 5-9, while in garrison, "vehicles and generators are generally stored in unit motor pools" and access to a motor pool is limited.); Army Reg. 405-70, Utilization of Real Property (12 May 2006) ("inside parking areas" is garage space that is used for parking of motor vehicles including motor pools and "light industrial areas" are areas are normally not "directly associated with office space and attendant storage requirements including….motor pool service areas.").

[5] Our superior court gives deference to the service courts' interpretation of regulations issued by their own departments. *United States v. Shavrnoch*, 49 M.J. 334, 338 n.2 (C.A.A.F. 1998) ("giving significant deference to the Courts of Criminal Appeals in the interpretation of the regulations issues by their own departments."); *United States v. Manuel*, 43 M.J. 282, 297; (C.A.A.F. 1995); *United States v. Moultak*, 24 M.J. 316, 318 (C.M.A. 1987); *United States v. Johanns,* 20 M.J. 155 (C.M.A). *cert. denied*. 474 U.S. 850 (1985).

habitation, storage, or to perform work functions.[6]  Generally, a motor pool bay[7] is a building within the motor pool area where vehicles and equipment are also stored and protected from outside exposure and maintenance and repairs are performed on military vehicles.  As distinguished from fenced outside motor pool areas, motor pool bays are completely enclosed by walls, roofs, and usually floors and the enclosed motor pool bay area is climate controlled with heating and air conditioning.[8]

The charge of housebreaking and stipulation of fact were unambiguously clear in describing appellant's entry into both the motor pool and motor pool bay with intent to commit larceny.  During the providence inquiry, the military judge clearly made a distinction between unlawful entry into the motor pool and motor pool bay.  The military judge, in explaining the elements, was clear that housebreaking required an unlawful entry into a building or structure.  She defined a building as a room, store, or office and structures as including enclosures similar to buildings and

---

[6] *See* Army Reg. 420-1, Army Facilities Management, Rapid Action Revision (RAR) Issue Date 24 August 2012 (An "open-bay facility" is a large room housing thirty to sixty people. Table 3-7, "open bay" living areas are authorized for E-1 through E-4 attending AIT/ASI and the "open bay comprises all the [space] within the peripheral walls."; National Guard Pam. 415-2, Army National Guard Facilities Allowances, dated 25 January 2015 ("General Purpose Work Bays (GPWB) are those in which mechanics repair, replace, or adjust the operational mechanisms of vehicles and equipment."  All work bays at a facility will be the same size (32 feet x 64 feet) to facilitate design and construction); Army Regulation 140-483, Army Reserve Land and Facilities Management (24 July 2007) ("Work bays are authorized based on the number of automotive (wheeled and tracked) and engineer equipment mechanics.").

[7] The customary military term for "bay" is consistent with the civilian meaning of "bay" as a building with an enclosed area.  Merriam-Webster defines "bay" as "(1) a principal compartment of the walls, roof, or other part of a building or of the whole building; (2) a main division of a structure; (3) any of various compartments or sections used for a special purpose (as in an airplane, spacecraft, or service station)." Merriam-Webster's Collegiate Dictionary 104 (11th ed. 2014).

[8]  When occupied as active working spaces "maintenance bays" will be heated or cooled to sixty degrees Fahrenheit.  Dep't of the Army Pam. 415-28, Guide to Army Real Property Category Codes (10 July 2013) ("For facilities measurements of maintenance type facilities, a 'single bay' is 32 feet x 32 feet and a 'double bay' is 64 feet x 32 feet.").  This guidance further supports that maintenance bays are enclosed buildings.

dwellings. Appellant stated he understood the elements of housebreaking required unlawful entry into a building or structure. Appellant in the stipulation of fact and providence inquiry admitted that he entered three motor pools that were all fenced areas. For two of the motor pools, appellant and the other soldiers had to cut locks off the gates in order to enter. On two occasions, once inside the fenced motor pool areas, appellant admitted to separately entering the motor pool bay buildings through unlocked doors.

Appellant worked in the motor pool and maintained vehicles; he clearly understood the distinction between a "motor pool" and "motor pool bay" when agreeing to the language of the stipulation of fact and during his providence inquiry.[9] In his providence inquiry, appellant stated one of the motor pools and motor pool bays was his place of duty during the day, where his unit conducted formations, and his unit kept their property. Appellant elaborated on his familiarity with motor pool bays when he described in his unsworn statement that on his second deployment to Iraq he spent most of his time "in the shop working the bay fixing air conditioners." The unlawful entry to commit larceny in his unit's motor pool *and* motor pool bay was also included in the stipulation of fact.

The housebreaking specification alleged all the elements of the offense charged, the appellant pleaded guilty to the specification, the providence inquiry established that the appellant believed he was guilty of unlawfully entering a building ("motor pool bay") to commit a larceny, and the factual circumstances

---

[9] We do not and did not consider allied documents outside the record of trial to determine the factual or legal sufficiency of an appellant's plea of guilty. *United States v. Cade*, 75 M.J. 923 (Army Ct. Crim. App. 2016) (record of trial does not normally include allied documents). However, our interpretation here is consistent with the pretrial investigation contained in the allied documents. Appellant made a sworn statement to CID and distinguished between motor pools and motor pool bays. In the sworn statement, appellant stated on 11 October 2013, he and the other soldiers cut the locks to the back gate of a "motor pool." The back door of the motor pool building was unlocked. Appellant and the other soldiers entered the building, looked through the "bays," and stole batteries. On or about 12 October 2013, appellant and another soldiers cut the lock to another motor pool gate. They entered an unlocked door to a building and searched a trailer in the "bay" for tools and equipment to steal. Appellant's unadmitted sworn statement to CID in the allied documents, is an example of how a contested trial could have developed additional facts about appellant's unlawful entry into the motor pool and motor pool bay. *United States v. Barton*, 60 M.J. 62, 65 (C.A.A.F. 2004) ("a guilty plea is less likely to have developed facts").

revealed by the appellant objectively support the guilty plea. Therefore, the appellant's plea was provident to "motorpool bays."

In light of *Wilson*, we except the words "a motorpool and" in the Specification of Charge III in our decretal paragraph.

### D. Dilatory Post-Trial Processing

The convening authority took action 347 days after the sentence was adjudged, all of which are attributable to the government. The record in this case consists of two volumes, and the trial transcript is 130 pages. The overall post-trial processing from sentence to receipt by this court was particularly slow. For example, it took twenty-nine days to complete the staff judge advocate's Post-Trial Recommendation (SJAR), seventy-six days to serve appellant the record of trial, and twenty-five days to complete the SJAR Addendum.[10] The time from action until the record was received by this court was 43 days. This amounts to 227 days beyond the point where we presume unreasonable delay in post-trial processing at action and thirteen days more than is expected for receipt of the record by this court. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). The government concedes there is no reasonable explanation for the delay in either transcribing the record or in serving the authenticated record on appellant.

Appellant's sentence to three months confinement was completed before he had an opportunity to submit his matters pursuant to R.C.M. 1105/1106 [hereinafter Post-Trial Matters]. However, given his short sentence, appellant would also have likely been released from confinement prior to action if the government complied with the *Moreno* post-trial processing standards. Although we find no due process violation in the post-trial processing of appellant's case, we will review the appropriateness of the sentence in light of unjustified dilatory post-trial processing. UCMJ art. 66(c). *See generally United States v. Toohey*, 63 M.J. 353, 362-63 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F.2002)

---

[10] Appellant's defense counsel took nineteen days to complete review of the record of trial. The military judge took twenty-one days to complete the review of the record of trial. Contrary to the government's position on appeal, we do not find the nineteen days should be deducted from the government's post-trial processing time. A reasonable length of time for review of the record of trial by defense counsel would normally be built in as part of the *Moreno*-presumed reasonable processing time of 120 days. If the amount of time defense counsel took to review the record was unreasonable, then the government would not have to wait to complete post-trial processing once the record of trial was authenticated by the military judge. Either way, the nineteen days was not deducted from the overall 390 day post-trial processing from sentence to receipt of the record by this court.

("[Pursuant to Article 66(c), UCMJ, service courts are] required to determine what findings and sentence "should be approved," based on all the facts and circumstances reflected in the record, including the unexplained and unreasonable post-trial delay."); *United States v. Ney*, 68 M.J. 613, 616–17 (Army Ct. Crim. App. 2010); *United States v. Collazo*, 53 M.J. 721, 727 (Army Ct. Crim. App. 2000).

The record of trial is only 130 pages and the case involves charges and matters of no great complication. The government's lack of explanation for its excessive delay in processing, in combination with the excessive time it took to deliver the record to this court, when considered in light of the record as a whole, convinces us that relief is warranted. The government concurs that appellant is entitled to some relief. The unexplained delay between announcement of sentence and action is simply too long. Thus, we find relief is appropriate under the facts of this case and grant appellant thirty days confinement credit.[11]

## CONCLUSION

In light of *Wilson*, we AFFIRM the Specification of Charge III and Charge III as follows:

> In that [appellant] did, at or near Fort Hood, Texas, between on or about 4 October 2013 and on or about 17 October 2013, unlawfully enter a motor pool bay, the property of the U.S. Army, with intent to commit a criminal offense, to wit: larceny, therein.

We AFFIRM the remaining findings of guilty.

---

[11] The co-accused in this case similarly received thirty days confinement credit for the unexplained and unreasonable post-trial delay in their cases. *United States v. Krause*, 2015 CCA LEXIS 189, ARMY 20140388 (Army Ct. Crim. App. 9 Apr. 2015) (sum. disp.) (thirty days confinement credit for 204 days post-trial delay from sentence to action to process a 124-page record of trial); *United States v. Bettencourt*, 2016 CCA LEXIS 28. ARMY 20140284 (Army Ct. Crim. App. 21 Jan 2016) (sum. disp.) (thirty days confinement credit for 293 days post-trial delay from sentence to action to process a ninety-seven page record of trial) (sum. disp). Private First Class (PFC) Bettencourt and Private (PV2) Krause were tried by general court-martial. Private First Class Bettencourt was convicted and his approved sentence included a bad-conduct discharge, twenty-six (26) months confinement, total forfeiture of all pay and allowances and reduction to the grade of E-1. Private Krause was convicted and his approved sentence included a bad-conduct discharge, confinement for eight months, and reduction to the grade of E-1.

We are able to reassess the sentence on the basis of the errors noted and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986) and *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013). After considering the entire record and given the dilatory post-trial processing, however, we AFFIRM only so much of the sentence as provides for a bad-conduct discharge and confinement for two months. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings and sentence set aside by this decision, are ordered restored. *See* UCMJ arts. 58a(b), 58b(c) and 75(a).

Senior Judge MULLIGAN concurs.

Judge WOLFE concurring in part and dissenting in part.

I approach the issue of post-trial delay differently from my colleagues, and therefore reach a different result. This case, perhaps uniquely, exemplifies our differing approaches. I address here only cases of post-trial delay that do *not* amount to a violation of the due process rights of appellant.

Under Article 66(c), UCMJ, as I understand it, this court may only approve a sentence that "should be approved." A sentence may be correct in law and fact but still be inappropriate. As our review is not omnidirectional, it essentially means that we reduce sentences that in our judgement are too high. In other words, when we conduct a sentence appropriateness review we are, in effect, only reviewing to see if a sentence is too severe.[12]

If the sentence is just outright too severe, our duty is to lower the sentence such that it "should be approved." In such a case, no allegation of error is required to trigger a remedy. Although such relief is empirically rare, it is a review we conduct in each and every case regardless of whether there is an issue of post-trial delay.

In the case where there is unreasonable post-trial delay, we then face a second question: Did the unreasonable delay turn what was an appropriate sentence for appellant's crimes into an inappropriate sentence? Or, in this case, is three months of confinement too severe a punishment given appellant's offenses, the sentencing evidence, and the unreasonable delay by the convening authority?

---

[12] Taking into account that the trial court saw and heard the witnesses. UCMJ, art. 66(c).

The majority, by contrast, appears to treat post-trial delay akin to Article 13, UCMJ, credit. An unreasonable delay of a certain amount equates to some degree of sentence reduction. This approach has the advantage of initially appearing consistent. However, to me this case illustrates why the majority's approach is an inconsistent application of Article 66(c), UCMJ.

In a related case, this court approved a sentence for PFC Bettencourt that is over twelve times longer than the sentence we approve today. Perhaps this difference can be explained by differences in the record. Or, the discrepancy could reflect that judges on this court must exercise judgment and will naturally not always arrive at the same decision. If, on the other hand, we arrive at these differences in approved sentences because we have been treating relief for post-trial sentencing as akin to Article 13, UCMJ, credit; then I think this misstates our role under Article 66, UCMJ. If a two-month sentence (or thereabouts) should be approved here, then absent some difference in the record it should have been the approved sentence for PFC Betancourt. Or, alternatively, if twenty-five months was an appropriate sentence for PFC Betancourt even considering the post-trial delay in his case, than we should approve appellant's three month sentence. As PFC Bettencourt's case is not before us, I compare the cases only to illustrate the differences in approach and reach no actual conclusion on any case other than the one at bar.

Accordingly, I take the following approach in this case. I review the appropriateness of appellant's sentence holistically. I do not find appellant's sentence of three months confinement to be inappropriate, given his offenses, the evidence introduced at trial, and even considering that there was unreasonable post-trial delay in this case. While the unreasonable post-trial delay in this case reflects poorly on those who caused it by action or indifference, it did not make appellant's sentence of three months confinement and a bad-conduct discharge inappropriate. I would affirm the sentence as approved by the convening authority.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

14