# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist CEZAR M. LAZCANO**
**United States Army, Appellant**

ARMY 20150354

Headquarters, Fort Campbell
Steven E. Walburn, Military Judge (arraignment)
James W. Herring, Jr., Military Judge (trial)
Lieutenant Colonel Robert C. Insani, Staff Judge Advocate

For Appellant: Captain Cody Cheek, JA (argued); Colonel Mary J. Bradley, JA; Major Christopher D. Coleman, JA; Captain Cody Cheek, JA (on brief); Lieutenant Colonel Christopher D. Carrier, JA; Major Christopher D. Coleman, JA; Captain Ryan T. Yoder, JA; Captain Cody Cheek, JA (on reply brief); Lieutenant Colonel Christopher D. Carrier, JA; Major Christopher D. Coleman, JA; Captain Cody Cheek, JA (on supplemental brief).

For Appellee: Captain Catherine M. Parnell, JA (argued); Colonel Mark H. Sydenham, JA; Captain Samuel E. Landes, JA; Captain Catherine M. Parnell, JA (on brief and supplemental brief).

3 July 2017

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

A panel with enlisted representation sitting as a general court-martial convicted Specialist Cezar Lazcano [hereinafter appellant], contrary to his pleas, of a single specification of sexual assault by bodily harm against his fellow soldier, TM,[1] in violation of Article 120, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 920 (2012 & Supp. IV 2014). The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for three

---

[1] By the time of trial TM had separated from the Army.

years, forfeiture of all pay and allowances, and reduction to the grade of E-1.  On appeal, appellant questions the fitness of a panel member, Lieutenant Colonel (LTC) Bergman, to serve on his panel.  Alternatively, given that LTC Bergman was never voir-dired or challenged on the issue that appellant now claims disqualifies him, appellant claims his counsel was ineffective for not raising the issue at trial.[2]

## BACKGROUND

### A. *The Assault*

As the evidence in this case is central to our prejudice analysis, we provide a detailed description and assessment of the evidence.

In the early morning hours of 11 May 2014, appellant, TM, and a mutual friend and fellow soldier played drinking games and drank substantial amounts of alcohol.  Appellant and TM had no prior romantic relationship.  The third soldier would later leave after drinking himself into a stupor and vomiting in the bathroom.  As a result, and while he testified for both sides, he had little recollection of what happened on the night of the alleged assault.  Both TM and appellant would testify as to what happened next—providing versions of what happened that were substantially different in key respects.

TM testified appellant tried to kiss her and she rejected his advance.  She then asked him to leave the room, which he did, but only after slamming a chair into a table.  She then texted her platoon sergeant, Staff Sergeant (SSG) Ray and went to sleep.  TM lived in a first floor barracks room, and her bed was located next to the window.  She then awoke to appellant climbing through her window.  According to TM, appellant climbed on top of her while she initially tried to push him off.  She testified appellant then vaginally sexually assaulted her with his penis while she was

---

[2] In a supplemental assignment of error, appellant asserts the military judge's instructions on the elements of sexual assault (which mirrored the Military Judge's Benchbook instructions) failed to properly advise the panel on the mens rea needed to commit the offense in light of *Elonis v. United States*, 135 S. Ct. 2001 (2015).  As appellant affirmatively stated he had no objection to the instructions, any objection was at least forfeited if not waived.  *United States v. Davis*, 76 M.J. 224 (C.A.A.F. 2017).  Assuming forfeiture, any error did not amount to plain error as the error was neither plain and obvious, nor was it prejudicial.  Evidence of appellant's guilt was substantial.  Additionally, appellant's defense was actual consent, not mistake of fact to consent.  Appellant testified TM initiated every sexual act and was the sexual aggressor.  Appellant's testimony left no room for the theory he had mistakenly (whether negligently or recklessly) believed TM had consented.  In other words, this was not a case where appellant had an innocent or even negligent state of mind.

crying, in pain, and telling him to stop. Appellant then got off of her, grabbed baby wipes from TM's bathroom, and then wiped her genitals causing a burning sensation on her genitals.

TM further testified that after cleaning her genitals, appellant again assaulted her while she continued to cry and asked for her father. Her next memory was of her platoon sergeant coming to her aid and vague recollections of being in the hospital.

The government corroborated TM's story with the testimony of several witnesses.[3]

TM's platoon sergeant, SSG Ray, authenticated several text messages he received from TM during the course of the night.[4] The texts included an unclear message about how "he" had told her to lay down since "he has baby wipes." She then texted him "please help me I don't want it to happen again."

After receiving that last message TM's platoon sergeant testified he drove to the barracks in the pre-dawn hours. While en route, he tried to call her repeatedly. At one point, the call connected and he could overhear in the background TM screaming and crying while saying "no, no, no, I want my daddy" with a male voice in the background saying something unintelligible. Upon arriving at the barracks TM's platoon sergeant saw a Hispanic male with a build similar to appellant glance over his shoulder, and take off out of the barracks. Staff Sergeant Ray testified upon entering TM's room, he found her crying and hysterical. He then called the military police.

---

[3] In addition to the evidence we describe, a U.S. Army Criminal Investigation Command (CID) special agent testified TM's DNA was found in appellant's underwear and there were two sets of unidentifiable fingerprints on TM's window sill. The fingerprints were oriented in a manner consistent with someone climbing into the room from the outside. However, we do not address this evidence in depth as appellant's defense at trial was consent and there was evidence that both appellant and TM had climbed through the window.

[4] TM texted her platoon sergeant at 0338 and asked why her platoon sergeant and her squad leader were not inspecting her room anymore and asked why the squad leader wasn't checking her room at that time. Staff Sergeant Ray appeared to have found these initial texts confusing. Then, in a non-sequitur from her platoon sergeant's perspective, she texted her platoon sergeant "he told me to lay down since he has baby wipes." At 0407 she again texted her platoon sergeant "please help me I don't want this to happen again."

Private (PVT) Smith was sleeping in the room next to TM. Having gone to bed early, PVT Smith woke up in the middle of the night to "a lot of ruckus" coming from TM's room. She testified she heard "a bunch of crying and like a lot of movement, and [TM] saying [n]o, and stuff like that." Private Smith clarified she heard TM saying "No," more than once and heard her say "stop." Private Smith did not investigate what was happening to her neighbor.

The government also admitted the observations and statements of TM taken during a medical examination conducted by a sexual assault nurse examiner (SANE) that same morning. The examination revealed genital abrasions. Although by the time of trial TM would have only a limited recall of the exam, the nurse took detailed notes which were admitted into evidence. TM told the examiner she had feared appellant would do something and texted her platoon sergeant asking for someone to stop by the barracks. She said she tried to call her platoon sergeant, but appellant walked in, threw her phone away from her, grabbed her by the hair and threatened to "fuck the bitch out of me." At that point, the nurse's notes stated TM became tearful, pulled a blanket around her, and began rocking back and forth in her chair.

Appellant called two witnesses who contradicted parts of TM's story. Specialist (SPC) Garcia testified that the morning after the assault TM told her she had been sexually assaulted by appellant, but that TM stated appellant had fled through the window not the door as she had testified at trial. Sergeant (SGT) Sanders, whose testimony is detailed below, contradicted TM's testimony about appellant grabbing TM's arm a few months before the alleged assault.

Appellant then testified in his defense. According to appellant, TM had flirted with him all evening. Once they were alone, appellant stated TM initiated both oral and vaginal sex. Appellant denied fleeing the scene, and said he returned to his barracks room hours before TM's platoon sergeant arrived.

Appellant attempted to corroborate his testimony with a recording he made while in TM's room. He stated that during the middle of consensual sexual intercourse he needed to urinate and explained what happened next as follows:

> So at that point, I felt the need to urinate, which - - what we would call "break the seal." So I got up, I went to the restroom, and on the way back, I find her hanging out of the window halfway. For what reason, I don't know. And I - - that's whenever she comes back from the windowsill and she has her phone; she's on the phone with somebody. And when she turns around I take the phone from her, the screen illuminates and I automatically see "Staff Sergeant

Ray" on her call log.[5]  And they're still on the phone, so right then and there, I really don't know what to think.  I don't know if something's going on between them or something is about to happen, so I automatically—what I – I had my phone in my pocket, tried to take it out and . . . took a video recording.

In the video, appellant's fingers are covering the camera for almost the entire recording.  In substance, appellant introduced an audio recording.  The recording captures TM telling her platoon sergeant "nothing is going on, I'm not freaking out it's good.  We're good."  The recording then captures appellant whispering to TM "You were drunk.  You were drunk.  We good."  TM then strangely denies to appellant she called or texted anyone.  Appellant tells TM he heard her "calling somebody and you were crying."  She then twice again denies calling or texting anyone.

Overall, appellant's surreptitious recording did not advance his defense.  Under his theory of events, he recently engaged in oral and vaginal intercourse with TM that was completely consensual and at her initiation.  While he was briefly in the bathroom, TM in the early morning hours leans out the window (where she would be less likely to be heard by appellant) and calls her platoon sergeant.  Appellant then takes her phone away and sees who she is talking to.  *Only then does he begin to record the conversation.*  Confronted with her attacker, she then tells her platoon sergeant everything is fine, with appellant whispering a "you're drunk" explanation for the late-night call.  The recording is entirely consistent with the government's theory of a sexual assault victim calling for help while her attacker was in the bathroom, but getting off the phone when her attacker comes back in the room and offering denials (if drunk and implausible ones) for making a phone call.  And, in any event, even if in the recorded part of the conversation TM tells her platoon sergeant everything is "good," the combined effect of all her texts and calls to SSG Ray nonetheless causes him sufficient concern that in the middle of the night he drives onto post because he believes one of his soldiers is in distress.

Under cross-examination by the trial counsel, appellant admitted the date-time information of the phone calls would indicate he was in TM's room moments before SSG Ray would arrive.  This testimony was consistent with SSG Ray's testimony he saw someone matching appellant's description fleeing the barracks.  It was, however, contrary to appellant's earlier direct testimony of having left TM's room hours before SSG Ray arrived.

---

[5] On cross-examination appellant would inexplicably deny he ever took the phone from TM.

5

Additionally, appellant would explain on cross-examination this video was not disclosed during pretrial discovery because he only remembered he had this recording the night prior to testifying.[6]  Appellant explained he recently purchased a new phone and was reviewing videos from his old phone that had been uploaded to this phone and rediscovered the recording.  That is, after surreptitiously recording his conversation with TM, he forgot about the recording's existence throughout the trial preparation until the night before he was going to testify.

Finally, trial counsel confronted appellant with his conflicting statements to law enforcement.  While at trial appellant claimed TM had not been drunk, he told a CID agent that she was "lit," "gone" and "[s]he was gone, like drunk, stumbling and everything."  Trial counsel also confronted appellant with his prior statement in which he denied ever having intercourse with TM, then admitted to light touching, then admitted to trying to have sexual intercourse but without penetration, and finally admitted to sexual intercourse.

### B.  Disqualification of Lieutenant Colonel Bergman

Appellant's first assigned error is that one of the panel members, LTC Bergman, was biased against him.  This issue was never raised or discussed at trial, and accordingly the factual basis for appellant's claims are contained in affidavits submitted on appeal.  Some additional factual background is necessary to understand this issue.

### 1. Trial Testimony of Sergeant First Class Sanders

Sergeant First Class (SFC) Sanders was appellant's platoon sergeant during the time period of the charged offense.  The defense called SFC Sanders to testify during both merits and sentencing.  His total testimony took up just over ten pages of the record.

During merits, the defense added SFC Sanders at the last minute to the witness list to rebut a claim by TM.  She had testified about an encounter with appellant on Valentine's Day 2014—about three months prior to the charged offense.

---

[6] Perhaps for tactical reasons, the government did not object to the introduction of the recording.  In our review of the video, there is some evidence from which one could draw an inference that the end of the video was edited to be prematurely cut short.  TM's statement that appellant then threatened to "fuck the bitch out of her," if made, would have happened after the video ended.  The video introduced was never authenticated by a witness (i.e., whether the video introduced at trial had been altered).  Nonetheless, given the amount of evidence in the case it is not necessary for us to determine how to weigh any inference definitively.

TM stated she was briefly left alone with appellant in his room. TM testified appellant "started to pull me by the arm to his bed," saying "I'm single and you're single" and he didn't let go of her arm until somebody knocked on the door.

The defense called SFC Sanders to testify that in his opinion appellant could not have been in his barracks room on Valentine's Day 2014. He testified he was married on Valentine's Day 2014 and had several members from the unit attend the ceremony. Although he offered no personal knowledge of appellant's whereabouts on Valentine's Day, he testified the remainder of the platoon was in the field in the middle of a four to six-week exercise at the range.[7] Sergeant First Class Sanders offered no testimony directly relating to the charged offense.

In sentencing, SFC Sanders offered his opinion appellant was a good soldier, was proficient in his military occupational specialty (MOS), performed well during a deployment, was resilient, and had high potential for rehabilitation.

### 2. Additional Facts on Appeal

On appeal, both parties submitted affidavits. Appellant submitted an affidavit from SFC Sanders, who stated when he was called to testify during findings he recognized one of the panel members, LTC Bergman. He stated "a few months" prior to trial he attended Air Assault School with LTC Bergman. During the course, SFC Sanders served as the class leader. He stated "at some point" LTC Bergman reported him to his chain of command for having an "inappropriate relationship" with another soldier. He further stated an investigation determined the allegation was unfounded. Sergeant First Class Sanders stated he "noticed LTC Bergman was a member of the panel and informed the trial defense team of the issue."

Appellant requests an evidentiary hearing in order to resolve undeveloped facts in the record. The affidavits received on appeal do not explain the nature of the alleged inappropriate relationship or what caused LTC Bergman to report SFC Sanders for having an inappropriate relationship. While SFC Sanders speculates LTC Bergman likely recognized him, the converse is also possible. We have no information from LTC Bergman one way or the other about whether he recognized SFC Sanders or how he felt about him. While SFC Sanders's affidavit is unclear about exactly when he told the defense team of his concerns, the affidavit from the military defense counsel indicates SFC Sanders relayed his concerns during presentencing phase of the court-martial. While there are factual omissions in the affidavits, they are not necessarily contradictory, and we will assume the facts conveyed in SFC Sanders' affidavit are true. *United States v. Ginn*, 47 M.J. 236, 243 (C.A.A.F. 1997).

---

[7] We would take judicial notice Valentine's Day 2014 was a Friday.

### 3. *Voir Dire*

During voir dire, neither party asked the panel members if they knew any of the witnesses. While SFC Sanders was not a planned merits witness, he was expected to testify as a sentencing witness. All the panel members were asked the standard questions, including whether: "any members of the court are aware of any matter in which he or she believes may be a ground [for] challenge by either side?" and "[i]s any member aware of any matter that might raise a substantial question concerning your participation in this trial as a court member?" Lieutenant Colonel Bergman answered "no" to both questions. Appellant did not challenge LTC Bergman for cause and did not exercise a preemptory challenge.

## LAW AND ANALYSIS

### A. *Panel Members*

To obtain relief for an incorrect answer to a voir dire question a party must first demonstrate a juror failed to answer honestly a material question on voir dire and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial. *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 850 (1984). However, "a juror's mistaken, though honest, response to a question" is insufficient to warrant a new trial as it would require an "insist[ance] on something closer to perfection than our judicial system can be expected to give. *Id.*

The CAAF adopted *McDonough* in *United States v. Mack*, 41 M.J. 51, 55 (C.A.A.F. 1994). In *United States v. Sonego*, the CAAF determined that upon a showing of "a colorable claim of juror dishonesty" an appellant is entitled to an evidentiary hearing. 61 M.J. 1, 4 (C.A.A.F. 2005). Accordingly, for purposes of determining whether appellant has established a colorable claim we assume arguendo the facts contained in the affidavits submitted by appellant are true. *See*, *e.g.*, *United States v. Sowinski*, NMCCA 200202260, 2005 CCA LEXIS 260, at *9 (N-M Ct. Crim. App. Aug. 18, 2005) (applying *Sonego*). However, we do not direct an evidentiary hearing to resolve alleged facts that are conclusory or speculative. *Ginn*, 47 M.J. at 243. As we may decide this issue without resolving disputed facts, no post-trial hearing is necessary. *Id*.

Appellant argues LTC Bergman should not have sat as a panel member in appellant's trial because of his previous encounter with SFC Sanders. As LTC Bergman was never questioned about whether he knew SFC Sanders and was never challenged for cause, appellant frames this issue as a sua sponte duty for LTC Bergman to report his disqualification once he saw SFC Sanders testify. More precisely, appellant argues LTC Bergman's answer to the general voir dire questions

–while true at the time—*became* dishonest once he saw SFC Sanders testify. Appellant cites *United States v. Albaaj* in support of his argument.  65 M.J. 167 (C.A.A.F. 2007).

### *1.* United States v. Albaaj

In *Albaaj*, a panel member had been asked during voir dire if he knew a particular witness.  The witness was the brother of the accused and had worked directly for the panel member for a substantial period of time.  The witness also had the relatively unique name of "Emad."  The panel member denied knowing the witness.  Additionally, the CAAF summarized that the panel member's prior relationship with the witness was "openly antagonistic" towards the witness and had "questioned his honesty as recently as fifteen weeks before the court-martial."  *Id*. at 171.

The CAAF in *Albaaj* did not directly address whether the panel member had answered any voir dire question dishonestly—although that would be a fair inference from their summary of the case.[8]  Instead, the CAAF determined where we are dealing with a witness who is a brother of the accused, there is a risk the member might impart his feelings about the witness to the accused.  Those factors, when combined with [the panel member's] subsequent failure to disclose the relationship even after he realized his earlier response was incorrect, raises concerns about the impartiality of this member and the resultant fairness of the proceeding.  A "reasonable public observer" of Albaaj's court-martial would conclude the panel member's actions "injured the perception of fairness in the military justice system."  *Id*. at 171.

Appellant cites *Albaaj* for the principle panel members have a duty to inform the court-martial when they realize after the fact their answers to voir dire questions were incorrect.  Indeed the CAAF in *Albaaj* stated:  "If a court member learns of information during the trial which makes an earlier response to a voir dire question inaccurate, the member should so advise the court."  *Id*. at 170.  The court continued, "[t]he duty of candor does not stop at the end of voir dire but is an obligation that continues through the duration of the trial."  *Id.*

Applied to this case, appellant asserts LTC Bergman, upon seeing SFC Sanders, had a duty to report to the court-martial his answers to the broad voir dire

---

[8] A military judge found as fact the panel member initially answered the voir dire question honestly, even if incorrectly.  The judge also found the panel member's failure to correct his answer was *not* done in bad faith.  With these factual findings, *Albaaj* determined the panel member should have corrected his mistake upon realizing it—regardless of the absence of bad faith.

questions were incorrect. More specifically, appellant argues LTC Bergman had a duty to correct his answer to the general question of whether he was aware of any matter that might raise a substantial question as to his fairness.

We find this case distinguishable from *Albaaj* for several reasons.

First, in *Albaaj*, when the panel member stated he did not know a witness named Emad, this answer was false *at that time*. While it might have been unintentionally incorrect, it was nonetheless incorrect. Here, appellant does not assert LTC Bergman's answer to any question was incorrect at the time he gave it. Rather, appellant asserts that LTC Bergman's answer to broad questions, although factually accurate at the time he gave them, *became* incorrect when the defense decided to call SFC Sanders in the middle of trial.

Second, in *Albaaj*, the panel member was asked if he knew a specific witness with an unusual name. Here, neither party chose to voir dire the panel members on the potential witnesses and explore whether any panel member harbored any disqualifying biases or prejudices against the witnesses. Rather, appellant relies on the broad questions (asked as part of the standard "trial script") whether there was any reason why the panel member should not sit. Dep't of the Army, Pam. 27-9, Legal Services: Military Judges' Benchbook [hereinafter Benchbook], para. 2-5-1, Question 28 (10 Sept. 2014). Because appellant asks us to apply *Albaaj* to these broad general questions, *Albaaj* would essentially require the panel member to self-identify any issue which might be a basis for challenge. *Abaaj* rejects this very premise. "The duty to disclose cannot be dependent upon the court member's own evaluation of either the importance of the information or his ability to sit in judgment." *Albaaj*, 65 M.J. at 170. Indeed, the focus of *Albaaj* is on a panel member's response to "direct questions on voir dire" not general questions. *Id.*

Third, the witness in this case had a *substantially* different relationship with the panel member than in *Albaaj*. In *Albaaj*, the witness was the brother of the accused, which raised the concern any ill-will directed at the witness would be transferred to the accused. By contrast, SFC Sanders testified only to his professional interactions and observations of the accused. Also, in *Albaaj*, the panel member had a long history and an antagonistic relationship with the witness. Whereas here, there is a single (eventually unfounded) report that SFC Sanders engaged in an inappropriate relationship. Additionally, in *Albaaj*, the panel member had previously commented on the integrity of the witness—a factor that is key to a panel member's weighing of the testimony. While the differences in these cases are ones of degree, not kind, they are significantly distinguishable from *Albaaj*.

Fourth, expanding the scope of *Albaaj,* as appellant's reading of the case requires, calls into question the CAAF's subsequent decision in *United States v. McFadden*, 74 M.J. 87 (C.A.A.F. 2015). In that case, the CAAF clearly stated a

military judge has no sua sponte duty to excuse a panel member even when the military judge hears information which might be grounds for challenge. *Id.* at 88, 90. Although the comparison of the issues in the two cases is not squared on all four corners, it would be an odd result if there were an apparently greater burden on panel members than military judges to bring the factual basis for a potential challenge for cause to the parties' attention.

Fifth, and relatedly, the rules require "[t]he party making a challenge *shall* state the grounds for it" and "[t]he burden of establishing that grounds for challenge exist is upon the party making the challenge." Rule for Courts-Martial [hereinafter R.C.M.] 912(f)(3) (emphasis added). The burden on the moving party would be effectively shifted to the panel member to provide the grounds for challenge under appellant's reasoning. For appellant's read of *Albaaj* to be correct, a panel member would be expected to disclose all bases for challenge as a result of the single broad question of whether there is "any" reason why the panel member should not sit.

Finally, and most importantly, appellant's reading of *Abaaj* would be contrary to the Supreme Court's decision in *McDonough*, which was adopted by the CAAF in *Mack*:

> A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.

*McDonough*, 464 U.S. at 555, 104 S. Ct. at 849-50. That is, *McDonough* and *Mack* do not apply in circumstances where the factual basis for a challenge "should have [been] obtained from a [panel member] on voir dire examination." *Id.* The defense could have asked if any panel member knew SFC Sanders, but did not. Put yet another way, the information at issue here is "objectively" something appellant "should have obtained from [the panel member] on voir dire examination." *Id.*

### 2. United States v. Commisso

After briefs and oral argument in appellant's case, our superior court decided *United States v. Commisso*, 76 M.J. ___, No. 16-0555/AR (C.A.A.F. 26 June 2017). In this case, the CAAF held that the military judge abused his discretion by not granting a post-trial motion for a mistrial when three of the panel members mistakenly stated they had no prior knowledge of the case and failed to correct their answers to those questions during the course of the trial. *Id.* at *3.

We find it difficult to understand *Commisso* and *McDonough* together. *McDonough* says an honest but mistaken answer is not enough to warrant a new trial. 464 U.S. at 555. *Commisso* says the exact opposite and defines "dishonest" as failing to give "objectively correct answers." 76 M.J. ___ at *10 ("But the test for member dishonesty is not whether the panel members were willfully malicious or intended to deceive—it is whether they gave objectively correct answers." (citing *Albaaj*, 65 M.J. at 170)).

In short, while one can trace *Commisso* through an unbroken line of cases (*Albaaj* and *Mack*) directly back to the Supreme Court's decision in *McDonough*, we appear to arrive at the opposite conclusion of where we started. It is clear under *McDonough*, an honest but mistaken answer to a voir dire question does not warrant a new trial. It is also clear under *Commisso*, a mistaken answer, whether or not it is intentionally false, may be grounds for a mistrial.

We can reconcile *Commisso* and *McDonough* two ways.

The first is to say that *Commisso* is really a case about a military judge abusing his discretion in not granting a mistrial. That is, though still a high burden, the appellant in *Commisso* faced an easier burden in showing a mistrial should have been granted than he would have faced in showing a constitutionally unfair trial under *McDonough*. Applied to this case, as there was never a motion for a mistrial and the military judge was never made aware of the issue we address on appeal, *Commisso* would not be particularly persuasive.

Or second, and we think this is the more likely, military law has now parted ways from *McDonough*. *McDonough* is a case about a civilian jury. While courts-martial resemble civilian criminal trials in most respects, when it comes to the selection and seating of panel members we remain fundamentally different. *See generally*, Article 25, UCMJ. Accordingly, military justice has aggressively applied the doctrine of implied bias for panel member selection, has developed the liberal grant mandate for defense challenges, and has reviewed the decisions of trial judges in such cases with something substantially less than discretion. *See generally United States v. Rogers*, 75 M.J. 270 (C.A.A.F. 2016) (discussing implied bias); *United States v. Woods*, 74 M.J. 238 (C.A.A.F. 2015) (discussing the liberal grant mandate); *United States v. Peters*, 74 M.J. 31 (C.A.A.F. 2015) (a military judge is afforded less deference if an analysis of the implied bias challenge on the record is not provided). In short, given the different manner in which we select panel members, we also apply different appellate standards when reviewing panel member selection. In this regard, *Commisso* is consistent with a large body of military law that watches carefully over the selection of panel members at courts-martial.

However, even under this more favorable standard in *Commisso* appellant falls short. All of LTC Bergman's answers to voir dire questions were objectively

true when he gave them. As we explained above, for appellant's argument to be correct it would mean that a party would only need to ask a single question of each panel member. It would then be on the panel member to identify and voice any reason why he or she should not be seated as a panel member. This directly contradicts the CAAF's guidance that panel members do not determine their own qualifications.[9]

Accordingly, we fail to find that appellant has met his burden under *Albaaj, Commisso*, and *Sonego* to establish a colorable claim that a panel member answered a question dishonestly. Here, LTC Bergman was never asked if he knew SFC Sanders. A panel member cannot dishonestly answer a question that is never asked.

Instead, we believe appellant's claim of error is best framed as one of ineffective assistance of counsel. And, accordingly, it is the issue we next address.

*B. Ineffective Assistance of Counsel*

Appellant asserts his counsel were ineffective where, after being informed by SFC Sanders of his prior interaction with LTC Bergman, they failed to take any positive action. More specifically, appellant asserts that counsel 1) should have notified the court of the issue; 2) should have requested voir dire and challenged LTC Bergman; and 3) failed to properly preserve the issue for appeal.

To prevail on an ineffective assistance claim, appellant bears the burden of proving that the performance of defense counsel was deficient and that the appellant was prejudiced by the error. *Strickland v. Washington*, 466 U.S. 668, 698 (1984).

---

[9] However, our superior court has now twice stated panel members have a continuing duty of candor to tell the court-martial upon discovering they answered prior questions mistakenly or dishonestly. We would suggest amending the standard trial script in the Benchbook to inform them of this duty at the completion of voir dire. Given the decorum and formalities, such an instruction would guide any panel member who might be unclear as to how to bring such a matter to the attention of the military judge. Additionally, panel members view their service as a panel member as a solemn duty. Such an instruction would make clear it is their duty to inform the military judge of issues and would ameliorate any concern that a member is trying to avoid service by raising an issue to the military judge's attention. As we on appeal will hold them to a duty to self-report issues in cases like *Albaaj* and *Commisso*, there certainly can be no harm in instructing them as such. A specific instruction will assist in overcoming any residual hesitancy as well as tell them the manner of how to bring matters to the military judge's attention without informing the other panel members of the potentially disqualifying information.

13

With respect to *Strickland's* first prong, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689.

As to the second prong, a challenger must demonstrate "a reasonable probability that, but for counsel's [deficient performance] the result of the proceeding would have been different." *Id.* at 694. "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "It is not enough to show that the errors had *some conceivable* effect on the outcome." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (emphasis added).

We briefly address the first and last allegation of deficient performance by counsel. Appellant first argues his counsel were deficient in not raising concerns about LTC Bergman to the military judge. We see no possible deficient performance by counsel that is not subsumed by appellant's next claim that counsel should have voir dired and challenged LTC Bergman. As a military judge has no sua sponte duty to voir dire or challenge panel members, *McFadden*, 74 M.J. at 90, simply telling the judge of a possible issue with a panel member would not result in any relief. Obviously, however, in requesting to voir dire and challenge a panel member, counsel simultaneously notify the court of the basis for their request. Accordingly, we see this allegation of deficient performance as entirely wrapped into the appellant's claim his counsel should have voir dired and challenged LTC Bergman.

Likewise, we see no possible ineffective assistance from the failure of counsel "to preserve" the issue on appeal as we see no requirement for preservation. Here, appellant argues his counsel erred in not submitting a sworn declaration from SFC Sanders to the convening authority. Appellant's military defense counsel did however raise the SFC Sanders issue as legal error in post-trial matters he submitted to the convening authority under R.C.M. 1105. Appellant cites *United States v. Lofton*, 69 M.J. 386, 391 (C.A.A.F. 2011), for the proposition the convening authority is not required to grant post-trial hearings based on unsworn unsubstantiated statements. True enough. However, we do not agree with appellant that counsel "fail[ed] to properly preserve the issue for appeal." On appeal, appellant provided us with an affidavit. See *United States v. Cade*, 75 M.J. 923, 929 (Army Ct. Crim. App. 2016). We do not see how the absence of sworn affidavits in appellant's R.C.M. 1105 matters forfeits or affects any issue on appeal or affects our review on appeal. As the discussion to R.C.M. 1105(c)(4) states an "accused is not required to raise objections to the trial proceedings in order to preserve them for later review."

Accordingly, we now turn to the central issue in appellant's claim of error: the failure of appellant's defense counsel to voir dire and challenge LTC Bergman

after SFC Sanders informed the defense team of his prior contact with LTC Bergman.

### C. Deficient Performance

After SFC Sanders informed the defense counsel LTC Bergman previously reported him for having an inappropriate relationship, the defense counsel had several options.  There was risk in each direction.

First, the defense could have sought discovery from the government on the result of the investigation into SFC Sanders' allegedly inappropriate relationship.  This course of action would have allowed the defense team to develop facts that would inform their next steps without subjecting LTC Bergman to a mid-trial voir dire which might only serve to highlight the issue for LTC Bergman.  However, this option would have also informed the trial counsel of allegations of misconduct against the defense's only active duty sentencing witness who was to testify about appellant's good duty performance and potential for rehabilitation.

Second, the defense could have sought to question LTC Bergman about any bias he may have had towards SFC Sanders.  Appellant would have had the burden of establishing the factual basis for the grounds for challenge.  R.C.M. 912(f)(3).  A successful challenge would have ensured a biased member would not determine appellant's sentence and would also have been grounds for a subsequent mistrial motion.  On the other hand, an unsuccessful challenge would have also presented some risk and would again have notified the government of the allegation of misconduct against the only active duty sentencing witness.

A third option was to do nothing, perhaps saving the issue for post-trial and possibly appeal.  This course would have been an appetizing option if counsel viewed SFC Sanders' importance to the case during findings as low (i.e., unlikely to result in a mistrial).  As stated above, SFC Sanders' testimony during findings was limited to recounting that appellant was supposedly in the field on the Friday night of Valentine's Day 2014.[10]  This testimony refuted TM's testimony regarding an encounter she claimed she had with appellant several months prior to the assault, but did not directly address the charged offense.  This option also allowed the defense not to disclose unfavorable information to the government about a defense sentencing witness.  The risk of this option was obvious and potentially great as it left the panel member unchallenged.

---

[10] Even as to this testimony, SFC Sanders stated his knowledge of appellant's whereabouts appears limited to knowing that appellant's unit was at the range for a four to six week period that included Valentine's Day.  He did not appear to have any personal knowledge of appellant's location as he testified it was his wedding day, and appellant was not at his wedding.

Appellant's counsel did nothing. They did not request discovery, request additional voir dire of LTC Bergman, or take any other action. Note, however, we did *not* state that appellant's counsel "chose" to do nothing. The affidavits from appellant's counsel submitted by the government do not claim any tactical reason for their inaction. Indeed, appellant's military defense counsel gratuitously stated "I do not believe there was any tactical reason for not requesting further voir dire."

This scenario presents us with somewhat of a conundrum. We are required to determine whether counsel's "representation falls 'below an objective standard of reasonableness.'" *United States v. Akbar*, 74 M.J. 364 (C.A.A.F. 2015) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). From the record, it appears there may be reasonable tactical reasons why appellant's counsel could have chosen not to voir dire LTC Bergman, but they subjectively did not consider them. Put as a question: can counsel be deficient under *Strickland* if they mistakenly choose a course of action a competent counsel may have also chosen? If two attorneys are presented with the same issue, and choose the same course of action, is it possible that one provided constitutionally deficient counsel and the other was competent?

In *Harrington v. Richter*, 562 U.S. 86 (2011) the Supreme Court appears to have answered our question. The Ninth Circuit set aside Richter's conviction and found his counsel was ineffective because "[i]n his deposition, [the defendant's] counsel was unable to provide any reasoned explanation for failing to consult forensic experts or to seek expert testimony in order to corroborate his client's testimony or prepare to rebut the prosecution's case." *Richter v. Harrington*, 578 F.3d 944, 958-59 (9th Cir. 2009), *rev'd sub nom. Harrington v. Richter*, 562 U.S. 86 (2011).

The Ninth Circuit Court went on to state when defense counsel gives "no strategic reason for failing to perform what would otherwise constitute the duty of a reasonably competent counsel, we may not invent such a strategy by engaging in a *post hoc* rationalization of counsel's conduct in lieu of relying on an accurate description of counsel's deliberations prior to trial." *Richter*, 578 F.3d 959 (internal citations and quotations omitted).

Without dissent, the Supreme Court rejected the Ninth Circuit's reasoning.[11] The Supreme Court considered several reasons why the defense counsel *might have* acted as he did. After offering several reasons why the counsel could have reasonably made the trial decisions he did, Justice Kennedy explained the error of the circuit court's reasoning:

---

[11] Justice Ginsberg concurred in the result. Justice Kagan did not participate. *Harrington*, 562 U.S. at 90.

> The Court of Appeals erred in dismissing strategic considerations like these as an inaccurate account of counsel's actual thinking. Although courts may not indulge "*post hoc* rationalization" for counsel's decision making that contradicts the available evidence of counsel's actions, *Wiggins*, *supra*, at 526-527, 123 S. Ct. 2527, 156 L. Ed. 2d 471, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough* v. *Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) *(per curiam)*.

*Harrington*, 562 U.S. at 109-10.  The Court then addressed the fact that Richter's own counsel had not offered any reasoned explanation for failing to seek expert assistance:

> After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.  *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. 466 U.S. at 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

*Harrington*, 562 U.S. at 109-10.

Here, while we acknowledge appellant's counsel avers he "cannot think of a tactical reason" for his actions, this action or inaction is not dispositive on the issue of whether his conduct was constitutionally deficient.  Under *Harrington*, we do not focus on his *subjective* after-the-fact evaluation of his own performance, but rather look at his conduct objectively.  Just as we would reject an objectively unreasonable claim a trial decision was made for tactical or strategic purposes, we must also reject a subjective claim disavowing a tactical reason for a trial decision if the decision was objectively reasonable and supported by the facts in the record.

Ultimately, however, we decline to determine whether appellant's counsel's performance was constitutionally deficient as we can resolve the issue on *Strickland's* second prong.  That is, notwithstanding our detailed discussion above, we do not determine whether the defense team's conduct was objectively reasonable under the circumstances.  *Strickland* 466 U.S. at 697 ("[a] court need not determine

17

whether counsel's performance was deficient before examining the prejudice suffered by the [appellant] as a result of the alleged deficiencies."). Our concern here is the lack of briefing by the parties.

Turning to prejudice, we do not find appellant has met his burden.

The parties disagree as to how we should determine prejudice. The government argues we should determine appellant failed to meet his burden of establishing prejudice as there is no evidence that LTC Bergman was biased. Indeed, there is no evidence that LTC Bergman recognized SFC Sanders at all. The difficulty of the government's position is it invites us to order a hearing pursuant to *United States v. Dubay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967) [hereinafter *DuBay* hearing], to answer these questions.

In contrast, appellant inserts an implicit bias test for challenges for cause into the prejudice prong under *Strickland* and argues as follows: "[T]he information provided to the defense counsel provided a valid challenge for cause against LTC Bergman: a reasonable public observer would question the fairness of the military justice system in a sexual assault case where a panel president recently accused a key defense witness of having an inappropriate relationship."[12]

We understand this argument to mean appellant will have established prejudice if he can demonstrate: 1) a challenge for cause would have been granted because the panel member was implicitly biased against a defense witness; and 2) the witness was "key" or material. At least as we have reframed it, we agree with appellant's position. There is no prejudice to appellant if the challenge for cause would not have been granted. There is no prejudice to appellant if the witness is tangential, cumulative, or not material. Or, framed as *Strickland* requires, appellant must demonstrate "a reasonable probability that, but for counsel's [deficient performance] the result of the proceeding would have been different." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Strickland*, 466 U.S. at 694).

Indeed, in *Weaver v. Massachusetts*, the Supreme Court made clear even in cases of forfeited structural error, appellant has the burden of proving prejudice in the context of an ineffective assistance of counsel claim. *Weaver v. Massachusetts*, No. 16-240, slip. op. at 18-19 (U.S. June 22, 2017):

---

[12] The defense counsel only became aware of the issue during sentencing. That is, counsel could not be ineffective for failing to raise the issue unknown to him during findings. At oral argument, appellant wrapped the guilty finding into the ineffective assistance issue by claiming that the defense should have asked for a mistrial during sentencing. However framed, we see the core legal issues to be the same.

> The question then becomes what showing is necessary
> when the defendant does not preserve a structural error on
> direct review but raises it later in the context of an
> ineffective-assistance-of-counsel claim. To obtain relief
> on the basis of ineffective assistance of counsel, the
> defendant as a general rule bears the burden to meet two
> standards. First, the defendant must show deficient
> performance—that the attorney's error was "so serious
> that counsel was not functioning as the 'counsel'
> guaranteed the defendant by the Sixth Amendment."
> *Strickland* v. *Washington*, 466 U. S. 668, 687, 104 S. Ct.
> 2052, 80 L. Ed. 2d 674 (1984). Second, the defendant
> must show that the attorney's error "prejudiced the
> defense." *Ibid.*

*Weaver*, No. 16-240 at 22-23. In accordance with *Weaver* we find that the burden to establish prejudice, even in cases involving arguably impliedly biased panel members, remains with appellant.

With regard to findings, we do not see SFC Sanders as a material (or "key") witness. As previously recounted, SFC Sanders testified appellant could not have grabbed TM's arm on Valentine's Day because appellant was in the field. This testimony, which totaled four pages, contradicted TM's testimony about Valentine's Day but did not directly prove or disprove any element of the assault that happened in May. Additionally, SFC Sanders by his own testimony had no personal knowledge of appellant's whereabouts on Valentine's Day as he was attending his own wedding. *See* Mil. R. Evid. 602. As his testimony was admitted without objection, we consider it, although the admitted lack of personal knowledge subtracts from the weight we might otherwise give it.[13] As SFC Sanders' testimony during findings was not material, appellant has not demonstrated any alleged deficient performance by his counsel would have mattered.

With regard to sentencing, we face a tougher decision. Three defense witnesses testified in sentencing. In addition to SFC Sanders, the defense also called Ms. Candice Schrieber. Like SFC Sanders, Ms. Schrieber was a former supervisor of appellant who had known him for two years. Both testified to his good duty performance, his potential to be a non-commissioned officer, and his potential to rehabilitate or "bounce back" from his misconduct. While the testimony of SFC Sanders and Ms. Schrieber were similar, we do not find them cumulative. Even so, given appellant's relatively lenient sentence for his offense, we again do not find

---

[13] Appellant testified, but was never asked whether he was in the field on Valentine's Day 2014, thus undermining any importance of the issue.

appellant has met his burden of establishing prejudice. Appellant received a sentence to three years confinement, total forfeitures, reduction to E-1, and a dishonorable discharge. Appellant's crime was violent and his testimony during trial was mendacious. *See* Benchbook, para. 8-3-38. TM testified credibly and at length regarding the harm she suffered from appellant's crime. For this offense, appellant received ten percent of the maximum period authorized and substantially less than the four to seven years recommended by the trial counsel. We do not find appellant has met his burden of showing a reasonable likelihood that counsel's performance, assuming it was deficient, would have resulted in a different sentence.[14]

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[14] We again note had his defense counsel raised any issue regarding SFC Sanders, the government would have been notified of the allegations of misconduct against SFC Sanders, possibly subjecting SFC Sanders to impeachment.