# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
WOLFE, SALUSSOLIA, and ALDYKIEWICZ
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Captain ADAM J. MYER**
**United States Army, Appellant**

ARMY 20160490

Headquarters, Fort Campbell
Matthew A. Calarco, Military Judge
Lieutenant Colonel Robert C. Insani, Staff Judge Advocate

For Appellant: Captain Augustus Turner, JA (argued); Lieutenant Colonel Tiffany Chapman, JA; Captain Joshua B. Fix, JA; Captain Augustus Turner, JA (on brief); Lieutenant Colonel Tiffany D. Pond, JA; Major Todd W. Simpson, JA; Captain Augustus Turner, JA (on reply brief).

For Appellee: Captain Brian Jones, JA (argued); Lieutenant Colonel Eric K. Stafford, JA; Major Pamela Perillo, JA (on brief).

10 January 2019

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ALDYKIEWICZ, Judge:

Appellant, a married chaplain, alleges that his conviction for conduct unbecoming an officer and gentleman for engaging in incest with his legally adopted, eighteen-year-old daughter is "unconstitutionally vague" as applied to him. We disagree. Appellant further alleges he was denied effective assistance of counsel "where defense counsel failed to reasonably investigate, present crucial evidence, and cross examine witnesses." We likewise find this allegation to be without merit. Both are addressed below.[1]

---

[1] After due consideration of appellant's third assignment of error, dilatory post-trial delay in violation of *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), as well as those matters personally raised by appellant pursuant to *United States v.*

(continued . . .)

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault, two specifications of assault consummated by a battery, two specifications of assault consummated by a battery on a child under the age of sixteen, and two specifications of conduct unbecoming an officer and gentleman in violation of Articles 120, 128, and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 928, and 933 (2012) [UCMJ]. The convening authority approved the adjudged sentence of a dismissal and eight years confinement.

## BACKGROUND

Appellant's assaults all involve family members as victims. He was convicted of multiple batteries against his adopted son, NM; multiple batteries against his wife, MM; and, sexual assault against his adopted daughter, EM. The non-assault convictions, that is, his conduct unbecoming an officer and gentleman, involves one specification of incest with EM, and one specification of wrongfully and dishonorably attempting to influence MM and EM from being cooperative and truthful during the law enforcement investigation into appellant's misconduct.

Appellant and MM, his wife of twenty-one years at the time of trial, legally adopted NM and EM when they were two and five respectively. From approximately age two-and-a-half until adopted, EM was in appellant's and MM's care and custody as foster parents.

*Assaults Against Son*

Between on or about 6 December 2012 and on or about 1 March 2013, appellant assaulted NM twice in the family home in Clarksville, Tennessee.[2] On one occasion, appellant saw NM "upset," and told him to leave the room.[3] As NM attempted to leave, he inadvertently bumped appellant's leg causing appellant to "[throw NM] across the room." Sometime thereafter, NM once again found himself

---

(. . . continued)
*Grostefon*, 12 M.J. 431 (C.M.A. 1982), we have determined they warrant neither discussion nor relief.

[2] NM was thirteen years-old at the time of both assaults, and seventeen at the time of trial.

[3] MM's undisputed testimony was that NM, at the times relevant to the charged offenses, "has a low [intelligence quotient] and emotional age of a six-year-old. So, he tends to have tantrums like a six-year-old would." When asked how he acted during the tantrums, MM responded, "[h]e yells or cries." Both MM and EM confirmed that NM was prone to anger and outbursts that included violence.

"upset." As NM attempted to go upstairs to see his mother, something he often did when upset, appellant tackled him from behind on the stairs, pushed him into the staircase, and "sat" on his back.

### Assaults Against Wife

The next victim of appellant's anger was his wife, MM, who refused appellant's demand on Mother's Day 2015 that she discipline NM for simply sitting in the kitchen and "doing nothing at the table." Her refusal to acquiesce to appellant's demand coupled with her apparent focus on her cell phone, rather than appellant, resulted in appellant grabbing her arm. Nearly four months later, appellant, again, assaulted MM, this time holding her down as he grabbed her arms. This second assault occurred as MM held their one-and-a-half year old son.

### Sexual Assault of Daughter and Incestuous Unbecoming Conduct

The last of appellant's victims was his daughter, EM. In approximately the beginning of July 2015, appellant and EM travelled from their home in Clarksville, Tennessee to Fayetteville, North Carolina to work on appellant's rental property. During the trip, appellant and EM stayed in several hotels. One night, after falling asleep fully clothed, EM awoke with her pants and underwear pulled down below her knees and appellant, her father, digitally penetrating her vagina. Crying, EM asked appellant to stop, which he did.

About one week later, after returning to Clarksville, Tennessee, appellant and EM, unbeknownst to appellant's wife, engaged in a sexual relationship.[4] Appellant's sexual relationship with his daughter lasted approximately four weeks and included appellant, again, digitally penetrating EM, and each performing oral sex on the other. These sexual acts occurred either on the couch in the family home, as MM and the family slept upstairs, or in appellant's car.

### Appellant's Admissions

On or about 2 August 2015, appellant entered the marital bedroom and told his wife, "I am taking my wife. I have chosen you. I am ready to be your husband again." He then proceeded to make varied admissions to MM about his relationship with EM. He admitted to kissing EM, touching her over her clothes, digitally penetrating her, and engaging in oral sex with her.

---

[4] EM testified that she thought the sexual activity with appellant after Fayetteville was "consensual" because she did not tell appellant to stop. She explained she did not tell appellant to stop because she was scared and did not know what he would do.

3

## LAW AND DISCUSSION

### A. Conduct Unbecoming an Officer and Gentleman

#### 1. Notice of Criminality

Appellant challenges his conviction for conduct unbecoming an officer and gentleman by engaging in incest with EM as being "void for vagueness" as applied to him. In short, he argues that he lacked sufficient notice that his sexual activity with his adopted daughter, EM, was proscribed.[5]

In support of his argument, appellant notes: incest "is exclusively a state crime [with] fifty unique legal definitions, defenses, and penalties across the country," and "engaging in consensual sexual activity with an adult, adopted child [ ] is not illegal in all states." In his "supplemental citation of authority," appellant points this court to seventeen states and the District of Columbia where appellant's sexual activity would not violate the relevant statute criminalizing incest.[6]

Appellant's "supplemental citation of authority" is noticeably silent with respect to the fourteen states and one territory where appellant's actions would, in fact, be criminal and would have been so in July of 2015. Of note, Tennessee, appellant's domicile, place of physical residence, and situs of the incest at issue, is among the states criminalizing digital penetration with an adopted child. *See* Tenn. Code. Ann. § 39-15-302.

"'Void for vagueness' [ ] 'means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (quoting

---

[5] Appellant does not challenge the sufficiency of the pleadings specifically. At trial, defense counsel acknowledged he understood which elements appellant had to defend against. *See, e.g.*, *United States v. Saunders*, 59 M.J. 1 (C.A.A.F. 2003) (military judge did not err in denying motion to dismiss Article 134 offense alleging stalking in Germany that was modeled after the Georgia stalking statute because it provided "fair notice" to the accused that his actions were criminal and was sufficiently specific to state an offense).

[6] *See, e.g.,* Ala. Code § 13A-13-3 (vaginal intercourse required); Alaska Stat. § 11.41.450 (blood relationship required); N.C. Gen. Stat. § 14-178 (carnal intercourse required); N.Y. Penal Law § 255.25 (blood relationship required). Additionally, appellant points to the government's dismissal of Specification 1 of Charge II, which alleged a violation of North Carolina's incest statute, a statute requiring "carnal intercourse," as further proof that appellant lacked the requisite notice that his actions with EM were criminal.

*Parker v. Levy*, 417 U.S. 733, 757 (1974)). "Due process requires 'fair notice' that an act is forbidden and subject to criminal sanction. *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998). It also requires fair notice as to the standard applicable to the forbidden conduct. *See Parker*, 417 U.S. at 755 (1974); *Vaughan*, 58 M.J. at 31. Sources of notice include: "the [*Manual for Courts-Martial, United States*], federal law, state law, military case law, military custom and usage, and military regulations." *Vaughan*, 58 M.J. at 31 (addressing notice in the Article 134, UCMJ context). The aforementioned list is not exhaustive. As Judge Sullivan noted in his *Boyett* concurrence, notice is also by "any other circumstance which would establish that a servicemember would have no reasonable doubt that his conduct was unbecoming an officer." *United States v. Boyett*, 42 M.J. 150, 161 (C.A.A.F. 1995).

> *2. What constitutes conduct unbecoming an officer and gentleman?*

Appellant argues there must be a custom of the service prohibiting incest in order for him to have been on notice that his conduct was criminal under the UCMJ. We disagree.

Conduct unbecoming an officer and gentleman has two elements: (1) that the accused did or omitted to do certain acts; and (2) that, under the circumstances, these acts or omissions constituted conduct unbecoming an officer and gentleman. *Manual for Courts-Martial, United States* (2012 ed.) [*MCM*], pt. IV, ¶ 59.b(1) - (2). "The focus of Article 133, UCMJ, is the effect of the accused's conduct on his status as an officer." *United States v. Diaz*, 69 M.J. 127, 135 (C.A.A.F. 2010) (citing *United States v. Conliffe*, 67 M.J. 127, 132 (C.A.A.F. 2009)). "The test for a violation of Article 133, UCMJ, is "'whether the conduct has fallen below the standards established for officers.'" *United States v. Conliffe*, 67 M.J. 127, 132 (C.A.A.F. 2009) (quoting *United States v. Taylor*, 23 M.J. 314, 318 (C.M.A. 1987)).[7]

---

[7] In describing the nature of the offense and examples thereof, the MCM states, in part:

> (2) *Nature of offense*. Conduct violative of this article is action or behavior in an official capacity which, in dishonoring or disgracing the person as an officer, seriously compromises the officer's character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer. . . . This article prohibits conduct by a commissioned officer, cadet, or midshipman which, taking all the circumstances into consideration, is thus compromising.

(continued . . .)

When an appellant argues that a statute is "unconstitutional as applied," we conduct a "fact specific inquiry." *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012); s*ee also*, *United States v. Amazaki*, 67 M.J. 666, 671 (Army Ct. Crim. App. 2010) ("'Each case must necessarily be decided on its own merit.'" (citations omitted)).

The military, unlike civilian society, is a unique society. "In military life there is a higher code termed honor, which holds its society to stricter accountability." *Fletcher v. United States*, 26 Ct. Cl. 541, 563 (U.S. Ct. Claims 1891). That officers play a unique and vital role in that specialized society is without question. *See, e.g.*, *United States v. Pitasi*, 44 C.M.R. 31, 37-38 (C.M.A. 1971) (affirming officer's conviction for fraternization under Article 134, UCMJ). Only three years later, in affirming the constitutionality of both Article 133 and 134, UCMJ, the Supreme Court noted:

> This Court has long recognized that the military is, by necessity, a specialized society separate from civilian society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history. The differences between the military and civilian communities result from the fact that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." . . . "[T]he military constitutes a specialized community governed by a separate discipline from that of the civilian," and that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty . . . ." We have also

---

(. . . continued)

> (3) *Examples of offenses.* Instances of violation of this article include knowingly making a false official statement; dishonorable failure to pay a debt; cheating on an exam; opening and reading a letter of another without authority; using insulting or defamatory language to another officer in that officer's presence or about that officer to other military persons; being drunk and disorderly in a public place; public association with known prostitutes; committing or attempting to commit a crime involving moral turpitude; and failing without good cause to support the officer's family.

*MCM* pt. IV, ¶ 59.c(2) - (3) (2012 ed.).

> recognized that a military officer holds a particular position of responsibility and command in the Armed Forces.

*Parker*, 417 U.S. at 743-44 (citations omitted).

"[O]ne critically important responsibility of a military officer is to inspire the trust and respect of the enlisted soldiers who must obey his orders and follow his leadership." *United States v. Frazier*, 34 M.J. 194, 198 (C.M.A. 1992) (officer who resides with an enlisted Soldier's wife is guilty of conduct unbecoming an officer and gentleman notwithstanding the absence of any custom, regulation, UCMJ provision, or express statute prohibiting the relationship or activity).

Contrary to appellant's assertion before this court, the absence of a "custom of the service" or promulgated prohibition, such as a UCMJ provision, regulation, or express statute, prohibiting incest is not dispositive of whether appellant was on sufficient notice that sexual activity with his eighteen-year-old daughter was unbecoming conduct. As our Superior Court noted in *United States v. Rogers*, "proof of a service custom or regulation [ ] 'has not commanded a majority of this Court' with the possible exception of officer-enlisted 'fraternization' cases charged under Article 133, instead of Article 134." 54 M.J. 244, 256 (C.A.A.F. 2000) (citation omitted); s*ee also United States v. Hartwig*, 39 M.J. 125, 130 (C.M.A. 1994) (purely private letter containing sexual overtures from Army Captain to fourteen-year-old girl constitutes conduct unbecoming an officer and gentleman notwithstanding absence of any "custom," regulation, or express prohibition prohibiting conduct); *Boyett*, 42 M.J. at 160-61 (custom or regulation not constitutionally required for a valid prosecution under Article 133, UCMJ).[8]

Unfortunately, appellant is not the first officer to be convicted at a general court-martial for incest. In 1994, the Air Force Court of Criminal Appeals affirmed an officer's incest conviction for engaging in consensual sexual intercourse with his natural daughter, a decision reviewed and affirmed by our superior court. *See*

---

[8] *See generally United States v. Maderia*, 38 M.J. 494 (C.M.A. 1994) (publicly associating with known drug smuggler was conduct unbecoming an officer); *United States v. Frazier*, 34 M.J. 194 (C.M.A. 1992) (living with enlisted subordinate's spouse under circumstances falling short of adultery or wrongful cohabitation substantially denigrates marital relationship to constitute conduct unbecoming); *United States v. Lewis*, 28 M.J. 179 (C.M.A. 1989) (officer convicted of charging fellow officer $2,000 for tutoring him in leadership skills constitutes unbecoming conduct, characterized by the court as "corrupt and demoralizing"); *United States v. Giordano*, 15 U.S.C.M.A. 163, 35 C.M.R. 135 (1964) (charging enlisted service members exorbitant interest rates on loan unbecoming conduct).

*United States v. Hutchens*, 1994 CMR LEXIS 30 (A.F. Ct. Crim. App. 1994), aff'd, 43 M.J. 177 (C.A.A.F. 1995) (consensual sexual intercourse between forty-six-year-old officer and natural born twenty-four-year-old daughter constitutes conduct unbecoming an officer and gentleman).[9]

For over twenty years, our superior court and sister courts have held incest to be unbecoming conduct. No military decision has held otherwise. While distinguishable from non-intercourse cases, we read *Hutchens* broadly as a commentary on the inappropriateness of sexual activity between father and daughter, activity that is without question unbecoming an officer and gentleman.

### 3. *Appellant's Conduct*

On the facts before us, we have no reasonable doubt that a forty-year-old Army officer, chaplain, husband of twenty years, and father of eleven children, who engages in sexual activity with his eighteen-year-old daughter, has engaged in conduct unbecoming an officer and gentleman. That the daughter is adopted is a distinction without a difference. That appellant's incestuous acts stopped short of "carnal intercourse," making it non-criminal in some states, is unpersuasive.

Equally unpersuasive is that appellant's actions would not be criminal in seventeen states and the District of Columbia. To be criminal under Article 133, UCMJ, the conduct at issue need not be criminal in all fifty states and five U.S. territories. That state laws vary in scope and applicability is no surprise. Appellant cites no authority requiring applicability or uniformity of state laws in order to punish conduct under Article 133, UCMJ.

Finally, appellant was not charged with or convicted of violating a "custom of the military service."[10] Appellant was convicted of conduct unbecoming an officer and gentleman by engaging in incest with his eighteen-year-old daughter, a person who has called him father since the age of approximately two-and-a-half, a legal obligation appellant assumed when his daughter was five. Any reasonable officer would recognize that engaging in sexual activity with his adopted daughter, under the circumstances of this case, would risk bringing disrepute upon himself and his

---

[9] That *Hutchens* involved intercourse with the officer's natural daughter instead of sodomy and digital penetration with the officer's adopted daughter are distinctions noted by this Court, but insignificant when considering whether appellant was on notice that his actions were proscribed.

[10] Put differently, having sexual intercourse with one's daughter is so grossly and obviously wrong that there has never been the need to declare it prohibited by Army custom. But if such a declaration is required, we would easily make it.

profession, seriously compromising his standing as an officer. *See, e.g., United States v. Hartwig*, 39 M.J. 125, 130 (C.M.A. 1994).[11]

## B. *Ineffective Assistance of Counsel*

Appellant's allegation of ineffective assistance of counsel is an attempt to re-litigate his court-martial with a shotgun blast of alleged errors referencing affidavits which provide information that is largely irrelevant, inadmissible, or both. Our review of the record, appellate pleadings, and all accompanying post-trial affidavits and their enclosures[12] reveal that appellant was neither deprived of a fair trial nor was the trial outcome unreliable. *See Strickland v. Washington*, 466 U.S. 668, 698 (1984). In other words, appellant fails to establish that he was prejudiced by his counsels' performance. Considering everything before us, appellant's trial defense counsel were not ordered to provide responsive affidavits nor was a *DuBay* hearing deemed necessary. *See United States v. Melson*, 66 M.J. 346, 350-51 (C.A.A.F. 2008) (requiring affidavit from defense counsel before finding IAC); *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967) (fact-finding hearing necessary if appellate court is unable to resolve conflicting affidavits).

Ineffective assistance of counsel claims are reviewed de novo. *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015); *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient and that the appellant was prejudiced by the error." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698 (1984)).

To meet his burden regarding deficiency, appellant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In other words, does counsel's performance meet an objective standard of reasonableness or was it beyond the "wide range of professionally competent assistance" counsel are presumed and expected to provide. *Id.* at 690. In evaluating performance, courts "must indulge a strong presumption that counsel's conduct falls within the wide

---

[11] While we need not give it any weight, appellant's marital status at the time and military occupational specialty of chaplain would appear to further undermine his argument.

[12] Appellant's written pleadings before this court refer to "[Defense] Appellate Exhibit A [AE A aka DAE A]" with varied page citations. A review of the Record of Trial, to include all appellate filings, reveals the absence of any Defense Appellate Exhibit [DAE] A. Defense appellate counsel confirmed that this was a scrivener's error and that [DAE] A should be [DAE] B.

range of reasonable professional assistance." *Id.* at 689. This presumption can be rebutted by "showing specific errors [made by defense counsel] that were unreasonable under prevailing professional norms." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001).

Prejudice is established by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Appellant must show "'a reasonable probability that, but for counsel's [deficient performance] the result of the proceedings would have been different.'" *Captain*, 75 M.J. at 103 (quoting *Strickland*, 466 U.S. at 694). "'[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Captain*, 75 M.J. at 103 (quoting *Strickland*, 466 U.S. at 695). "'It is not enough to show that the errors had some conceivable effect on the outcome . . . .'" *Captain*, 75 M.J. at 103 (citations omitted).

"An appellant must establish a factual foundation for a claim of ineffectiveness; second-guessing, sweeping generalizations, and hindsight will not suffice." *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005) (citing *United States v. Key*, 57 M.J. 246, 249 (C.A.A.F. 2002)); *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000); *United States v. Gray*, 51 M.J. 1, 19 (C.A.A.F. 1999). In assessing an appellant's IAC claim, the performance and prejudice prongs of *Strickland* can be analyzed independently and if appellant fails either prong, his IAC claim fails. *Strickland*, 466 U.S. at 697.

Appellant's IAC blast covers the traditional court-martial processing continuum: pretrial, trial, and post-trial, culminating with an alleged self-assessment by civilian counsel who, when asked by appellant why he did not present certain evidence, allegedly responded by stating that he "just spaced it."

*1. Pretrial Effectiveness of Counsel*

Appellant alleges that his defense counsel were ineffective because they failed to contact three potential witnesses: CR, BEM, and Dr. KC. In addition to appellant's affidavit, appellant submitted affidavits from CR, BEM, and CPT MB.[13]

---

[13] Captain MB wrote an affidavit stating he witnessed a phone conversation between appellate defense counsel and Dr. KC. Captain MB relates in the affidavit a summary of the conversation.

### a. Failure to Contact CR

A review of CR's affidavit reveals this witness lacked any first-hand knowledge of appellant's crimes. His affidavit focuses on his personal and sexual relationship with EM, his "suspicions" and speculation regarding EM's relationship with appellant, and his belief regarding EM's sexual maturity, noting "she is far too sexually advanced to be taken advantage of by [appellant]." Application of Military Rule of Evidence [Mil. R. Evid.] 401, 402, and 403, defining relevant evidence, its admissibility, and the exclusion of otherwise relevant evidence for "prejudice, confusion, waste of time, or other reasons," respectively, Mil. R. Evid. 412, prohibiting evidence of "other sexual behavior" and a "victim's sexual predisposition," and Mil. R. Evid. 802, "[t]he rule against hearsay" result in an affidavit of marginal value at best.

It is appellant's burden to establish prejudice. When appellant pursues a claim of IAC under a theory that certain other evidence should have been admitted, then appellant must at least demonstrate the evidence was admissible. At no point in the pleadings before this court does appellant provide his theory of admissibility for the information contained in CR's affidavit. For example, CR discusses, in rather graphic detail, his sexual encounters with EM. Appellant fails to articulate how this evidence is logically relevant to any of the charged offenses under Mil. R. Evid. 401 or admissible when considering Mil. R. Evid. 412.

Appellant has failed to meet his burden to establish prejudice by defense counsel's alleged failure to contact CR.[14]

### b. Failure to Contact BEM

A review of BEM's affidavit reveals, with the exception of character evidence regarding appellant's character for peacefulness, evidence that is largely inadmissible after application of Mil. R. Evid. 401, 402, 403, 412, and 802. With regard to the potentially admissible character evidence, appellant fails to establish any prejudice by its absence.

---

[14] We also conclude that the failure to call CR would have been objectively reasonable. Government appellate counsel makes an excellent point in their brief before this court, one that would, in fact, support a trial defense counsel's tactical decision not to call CR as a witness. "[C]ross-examination of Mr. [R] could have been harmful to appellant's case because [CR] stated the victim had confided in him that appellant raped her, was stalking her, and tried to run her off the road." In other words, CR would expose appellant to evidence corroborating, not rebutting, EM's allegation of sexual assault.

The first two paragraphs of BEM's affidavit address how EM allegedly sexually assaulted her and then her brother, NM, the victim of two of appellant's Article 128, UCMJ, convictions. Appellant fails to articulate how this evidence is logically relevant or admissible. BEM goes on to state she was eventually estranged from her parents and no longer resides in the home. Although her date of departure from the family home is unstated, it is clear from the affidavit that BEM was not residing at home at the time of the sexual activity between appellant and EM. In other words, she has no personal knowledge regarding the sexual assault or incest. Thus, the only information she can offer on the Article 120 and Article 133 convictions is both speculative and based on inadmissible hearsay.

The only evidence in BEM's affidavit that appears to be admissible is her opinion that appellant was a peaceful person toward his family, having "never known or observed [appellant] to be cross, harsh, abusive, or belittling to anyone." She adds, "[Appellant] was generally a very conservative and straight-laced guy."

Assuming without deciding that BEM could have provided character or reputation evidence regarding appellant's character for peacefulness consistent with Mil. R. Evid. 404 and 405, appellant fails to establish how the failure to introduce this evidence resulted in material prejudice to appellant. Having considered the omitted character evidence as well as the remainder of BEM's proffered testimony, we find appellant has failed to meet his burden to establish prejudice by defense counsel's alleged failure to contact BEM.

### c. Failure to Contact Dr. KC

Unlike CR and BEM, Dr. KC's proffered testimony comes to us not via an affidavit, but via affidavit from an individual who "witnessed a phone conversation" between Dr. KC and appellate defense counsel. Thus, the affiant has no personal knowledge of the matters (e.g., NM's violent tendencies) that we are being asked to credit. These facts are not properly before us. *See United States v. Cade*, 75 M.J. 923 (Army Ct. Crim. App. 2016).

Assuming arguendo we were to consider the affidavit, Dr. KC would have corroborated that NM was prone to violence, sometimes involving weapons, that law enforcement was called to deal with his outbursts, and that MM was scared of NM. This information, however, was already before the court and was uncontested.

NM testified that when he gets upset and is unable to calm down via his coping mechanisms, he will "yell," "scream," and "punch walls." He admitted to hitting his sister. He testified he was going to counseling because "I threatened to kill my mom." EM testified to NM's anger and violence, testifying that NM has hit her. She also testified that appellant has had to discipline him when he had his outbursts. MM testified that NM has hit his brothers and sisters. She also testified

12

to "problems downtown in Montgomery County as far as the juvenile court;" NM was "angry" and made a "verbal threat [to kill MM]."

Following the cross-examination of NM, EM, and MM, it was clear that appellant had to legitimately use force, at times, to restrain NM during his outbursts. In other words, the defense of parental discipline was clearly in play regarding both assaults of NM. *See, e.g.*, *United States v. Rivera*, 54 M.J. 489, 491 (C.A.A.F. 2001); *see also*, Dep't of the Army, Pam. 27-9, Legal Services:  Military Judges' Benchbook [Benchbook], para. 5-16 (10 September 2014).

Appellant fails to show, however, how failing to call Dr. KC, a witness whose testimony would have been cumulative, would have had any impact on the evidence already before the court.   We find appellant has failed to meet his burden to establish prejudice by defense counsel's alleged failure to contact Dr. KC.

### 2.  *Effectiveness of Counsel at Trial*

### a.  *Failure to call Captain KW*

Appellant alleges that CPT KW should have been called to testify to appellant's character for peacefulness towards his wife and children as well as MM's character for untruthfulness and motive to fabricate.  Appellant submits CPT KW's affidavit in support of this allegation.

We agree the affidavit does indicate that CPT KW would have testified that appellant was a good father and husband.  But, nothing in the affidavit presents a "motive to fabricate" unless the fact that appellant and his wife grew apart, separated, and eventually sought a divorce, without more, constitutes a "motive to fabricate."  Indeed any "motive" to fabricate likely originates in appellant's betrayal of MM, betrayal highlighted by appellant's sexual activity with their daughter, an issue appellant reasonably would want to avoid.

Nothing in CPT KW's affidavit, or any of the other affidavits, indicates that MM used the allegations against appellant to gain any advantage, legal, financial, or otherwise.  Beyond CPT KW's Mil. R. Evid. 404 and 405 character and reputation evidence regarding appellant's character for peacefulness, vis-à-vis appellant's interactions with his children, much of his affidavit is irrelevant testimony on the merits and marginally relevant testimony on sentencing.

Regardless, were we to assume everything in CPT KW's affidavit was admitted, we are confident the outcome of the proceeding remains unchanged.  Appellant has failed to meet his burden regarding prejudice as it relates to the failure to call CPT KW on the merits.

*b. Failure to use a 2013 Department of Child Services Investigation*

The Department of Child Services (DCS) Report contains some information favorable to appellant. It also contains information that is damaging and corroborative of NM's allegations that appellant is violent towards him. The favorable information includes statements by MM that she never witnessed appellant hit NM and that NM is violent and has made threats to his parents. The unfavorable information includes the DCS social worker's statements that NM complained of appellant beating him. It is objectively reasonable for a defense counsel to weigh these competing interests and avoid admission of the report.

Like the testimony of Dr. KC discussed above, much of the information sought, that NM is prone to violent outbursts, to include violence up to and including threatening to kill his mother necessitating Juvenile Court intervention, was already before the court. Appellant fails to proffer how the DCS Report or the evidence contained therein would be admissible considering Mil. R. Evid. 802, and if admissible, how it was to be used, and what impact, if any that might have had. In other words, appellant fails to establish prejudice regarding the alleged failure to "use" the 2013 DCS report.

*c. "Pressure" to plead guilty*

Appellant claims that his counsel were ineffective because they "pressur[ed]" him to plead guilty. This claim is frivolous on its face when, as here, appellant pled not guilty.

Appellant fails to cite, nor have we found, any authority that purports to find IAC when counsel applied "pressure" on their client to plead guilty in a case where the client did not plead guilty. In support of his claim, appellant submitted e-mail exchanges between him and his counsel concerning a possible guilty plea. Notably, defense counsel advised appellant that the charges against him are serious and estimated appellant would receive a sentence of, at least, between twelve to twenty-four months of confinement. Appellant replied that he was "unable to feel at ease with anything less than a trial." Fifteen minutes later, defense counsel acknowledged appellant's desire to not plead guilty and stated, "We will be ready for trial."

Rather than "pressure," the e-mail exchanges reveal appellant's defense counsel was concerned for his client and offered well-reasoned advice based on his years of experience as a criminal defense attorney.

Appellant fails to establish any deficiency, let alone prejudice, stemming from counsel's advice on whether to accept or reject a plea.

*d. Defense counsel's failure to file any motions beyond one motion to dismiss*

Appellant cites, in support of his IAC allegation, counsel's failure to file any pretrial motions beyond one motion to dismiss.[15]  Appellant fails, however, to state what pretrial motions counsel should have filed.  "'When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion [ ], an appellant must show that there is a reasonable probability that such a motion would have been meritorious.'"  *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (quoting *United States v. Napoleon*, 46 M.J. 279, 284 (C.A.A.F. 1997)).  As such, counsel necessarily must articulate what motions should have been argued.  Having failed to do so in this case, appellant has failed to show deficient performance or prejudice warranting relief.

*e. Defense counsel's failure to present evidence of EM's statements regarding the consensual nature of the relationship with appellant*

Appellant alleges deficiency stemming from trial defense counsel's failure to present evidence of alleged statements by EM to two law enforcement personnel and a private investigator regarding the consensual nature of her relationship with appellant.  First, the appellate filings fail to contain an affidavit from any of the three aforementioned personnel.  In other words, we have no idea what any of these potential witnesses would say under oath.  Next, the fact that EM told law enforcement the relationship, at least the post-Fayetteville sexual assault relationship, was consensual was successfully elicited during cross-examination.

Appellant fails to establish any prejudice from the lack of additional cross-examination of EM.  Regarding the sexual assault, appellant fails to provide any evidence, other than appellant's self-serving description of events in his affidavit, that EM told anyone that what occurred in the hotel room in Fayetteville, North Carolina was consensual.

*f. Failure to cross-examine JM*

Appellant alleges IAC regarding counsel's decision not to cross-examine JM, appellant's son.   Again, appellant does not articulate what evidence would have been elicited via cross-examination and what impact, if any, the failure to elicit said evidence would have had on the fairness or reliability of appellant's trial.  In other

---

[15] Defense counsel successfully moved to dismiss Specification 1 of Charge II, which alleged a violation of Article 133, UCMJ (incest in violation of N.C. Gen. Stat. § 14-178).  Defense counsel also successfully moved, pursuant to Rule for Courts-Martial [R.C.M.] 917, for a finding of not guilty to Specifications 1 and 2 of Charge III, violations of Article 90, UCMJ.

words, appellant fails to carry his burden in establishing deficiency or prejudice regarding the examination of JM.

We also note appellant ignores blackletter law when he argues JM should have been allowed to testify that he, JM, believed EM and her mother, MM, fabricated the charges against appellant. JM had no first-hand knowledge regarding any of the offenses nor any evidence that the two fabricated the allegations against appellant. What JM had was his "belief," nothing more, yet appellant believes he should have been allowed to testify to his belief regarding the veracity of the allegations. We disagree. *See, e.g.*, *United States v. Martin*, 75 M.J. 321, 324-25 (C.A.A.F. 2016) (human lie detector testimony prohibited).

### g. *Failure to impeach EM, NM, and MM*

Contrary to appellant's claim, a review of the record reveals defense counsel did, in fact, impeach NM, MM, and EM. That defense counsel's impeachment fell short of fully discrediting the witnesses does not establish deficient performance or prejudice. For example, defense counsel elicited testimony from EM about the consensual nature of her relationship with appellant following the Fayetteville sexual assault. Additionally, defense counsel elicited on cross-examination that EM was kicked out of the house following appellant's disclosure of the sexual activity and argued with her mother "on the porch." Regarding counsel's failure to impeach EM on her "modus operandi of sexually pursuing adoptive family members," appellant fails to show how this evidence would be admissible when considering Mil. R. Evid. 401-403, 412, and 803. The fact-finder, having evaluated both EM and appellant's credibility, concluded that the sexual act in Fayetteville was non-consensual.

Defense counsel was able to impeach NM by eliciting evidence during trial to corroborate that NM was prone to violent outbursts, that he has been violent towards family members, that he threatened to kill his mother, and that, at times appellant had to discipline NM or physically restrain him during his outbursts. The court found, consistent with NM's testimony, that the two charged incidences of assault were not incidences where appellant was simply exercising legitimate parental discipline; rather, on the two charged occasions, in NM's bedroom and on the stairs, the court found appellant battered NM.

Regarding the assault of MM, appellant offers no evidence of what counsel should have produced, either directly or through cross-examination, that would negate or call into question either assault.

To the extent there was any "failure to impeach" by defense counsel, the "failure" was in counsel's inability to get appellant's accusers to agree with appellant's version of events, a "failure" arguably found in every case where an

accused puts on a defense and is nonetheless convicted. Appellant fails to meet his burden to establish IAC regarding counsel's performance vis-à-vis impeachment of appellant's accusers.

*h. Appellant did not get a chance to testify to help himself*

Of all the allegations raised by appellant, this is the most disconcerting.

A military criminal accused, with the advice and assistance of counsel, has four decisions that are uniquely his: by whom he wants to be represented (i.e., counsel); what forum will hear his case; how to plead; and, whether to testify. *United States v. Summerset*, 37 M.J. 695, 699 (A.C.M.R. 1993).

Appellant's pleadings before this court claim his trial defense counsel "prevented" appellant from fully testifying regarding his relationship with EM and the other allegations. Appellant's affidavit states, "I didn't even get a chance to testify to help myself as [appellant's defense counsel] cut me off on the stand."

Regarding appellant's claim that he "did not get a chance to testify to help himself," we find that statement to be simply false. That counsel chose to limit the scope of appellant's testimony is clear from the record. It would appear counsel focused on defeating the sexual assault allegation and limiting appellant's exposure on cross-examination, a strategy that makes absolute sense when reviewing appellant's affidavit, his cross-examination testimony, and the record as a whole.

During the government's case, defense counsel elicited from EM, without objection, that appellant told her, immediately following the alleged sexual assault, that she was on top of him and that he thought she was "awake."

During the defense case, appellant testified to his belief that EM was awake and the aggressor when the sexual assault occurred, testimony consistent with the information counsel obtained from EM earlier. Appellant testified that he fell asleep watching a movie with EM and awoke to EM "rubbing up and down on my genitals" and then EM "got on top of me." He further testified that she did not appear to be asleep. He stated, "my adopted daughter was coming on to me, had sexually aroused me, was sexually aroused herself, and you know, we were engaging in a physical relationship at that point." He continued:

> So that went on for about somewhere between 5 and 10 minutes, you know, pretty, you know, vigorous contact. She gets to the point where she is moving into having an orgasm. You know, she's breathing heavy, moaning, arching her back, things like that, and right as she kind of gets to that point, I hear, which really kind of chilled me

17

and caught me off guard, she says, you know, "I can't believe you. You know, you are a Chaplain," and immediately, I stopped.

On cross-examination, appellant admitted telling his wife he digitally penetrated his daughter in Fayetteville, leaving consent the only contested issue on the sexual assault charge.

Appellant's allegation regarding his limited ability to defend himself relies entirely on his affidavit. His affidavit, however, like appellant's in-court testimony, focuses on the sexual assault allegation and the follow-on sexual activity in Tennessee. Had appellant testified consistent with the information in his affidavit, he would have certainly dispelled any doubt regarding the charge of incest and left only consent in dispute regarding the charge of sexual assault, an issue to which he did, in fact, testify. Regarding the remaining charges, appellant's affidavit is silent as to what appellant would have said if given the "chance." In other words, he proffers no testimony regarding the batteries or obstruction charges, at least none that would be exculpatory in nature, if "allowed."

Assuming arguendo that counsel limited appellant's testimony regarding all other offenses, we find appellant has failed to meet his burden to establish prejudice. As noted above, appellant's affidavit focuses on the sexual act in Fayetteville and the sexual acts in Tennessee. We do not know what appellant would have said if "allowed" to testify regarding the remaining offenses. It is his burden to put forth what evidence was kept from the trier of fact and what impact, if any, it would have had. Appellant has failed on both fronts.

### 3. Effectiveness of Counsel Post-Trial

Appellant asserts his defense counsel was ineffective post-trial because he failed to provide CPT KW's letter of support in his clemency matters. Appellant fails to establish a colorable showing of possible prejudice regarding this omitted submission. "In post-trial matters involving a convening authority's decision, 'there is material prejudice to the substantial rights of an appellant if there is an error and the appellant 'makes some colorable showing of possible prejudice.'" *United States v. Fordyce*, 69 M.J. 501, 504 (Army Ct. Crim. App. 2010) (citing *United States v. Wheelus*, 49 M.J. 283, 288 (C.A.A.F. 1998) (quoting *United States v. Chatman*, 46 M.J. 321, 323-24 (C.A.A.F. 1997))).

Appellant has made no showing of prejudice. Despite having ample time to submit the missing letter, none was submitted. Furthermore, while CPT KW submitted a post-trial affidavit, his affidavit is silent as to what was said in this missing letter. We find appellant failed to meet his burden regarding this omitted letter. It is not this court's responsibility to ascertain from a post-trial affidavit

what a missing clemency letter might have said and then to further speculate whether its omission prejudiced appellant. That burden belongs to appellant; he failed to meet that here.

### 4. *Counsel's Self-Assessment*

We end our lengthy discussion by commenting on appellant's assertion that his civilian counsel admitted to ineffectiveness via his claim that he, counsel, "just spaced it." Assuming arguendo that his defense counsel actually said this, we give slight weight to counsel's subjective, post-trial self-assessment of performance.

"After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." *Harrington v. Richter*, 562 U.S. 86, 109 (2011). In assessing counsel's performance, the standard is an objective one, not subjective. *Strickland*, 466 U.S. at 688. "The *Strickland* standard of objective reasonableness does not depend on the subjective intentions of the attorney, judgments made in hindsight, or an attorney's admission of deficient performance." *Jennings v. McDonough*, 490 F.3d 1230, 1247 (11th Cir. 2007). "Our task in deciding a claim of ineffective assistance is to determine whether counsel's performance was '*objectively* unreasonable.' *Blakeney v. United States*, 77 A.3d 328, 344 (D.C. Cir. 2013) (citations omitted). The issue is not counsel's sincerity but the reasonableness, 'considering all the circumstances,' of counsel's challenged judgment 'under prevailing professional norms.'" *Id.*

"[S]econd-guessing, sweeping generalizations, and hindsight will not suffice" to establish ineffective assistance of counsel. *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005) (citations omitted). The Constitution entitles an accused to a "fair trial, not a perfect one." *Deleware v. Van Arsdall*, 475 U.S. 673, 681 (1986). With the benefit of hindsight and varied affidavits, to include appellant's affidavit with enclosures, appellant attempts to re-litigate his court-martial. In so doing, appellant purportedly provides this court with evidence of both deficient performance by his counsel and resulting prejudice. In other words, appellant was denied a fair trial resulting in an unreliable outcome. We disagree.

### CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Judge SALUSSOLIA concurs.

MYER—ARMY 20160490

WOLFE, Senior Judge, concurring:

I concur fully with today's opinion. I write separately to explain my understanding on how this court weighs claims of IAC.

To my eye, several of the IAC claims we decided today fail on their face. That is, appellant does not state a prima facie claim of IAC. This is concerning as either (a) there exists a meritorious claim of IAC but it wasn't presented to us; or (b) facially invalid claims were submitted for our consideration. Both are troubling, but the first is more so. Failure to properly present a meritorious claim of IAC to this court will significantly affect the likelihood of success on any future direct or collateral attacks on the conviction.

*Why throwing it at the wall and seeing what sticks does not work for most IAC claims.[16]*

Most assigned errors this court reviews are contained in the record of trial. Under Article 66(c), UCMJ, this court conducts a de novo review of the entire record. Thus, we review a record for errors even when no errors are assigned and no specific relief is sought. At least for preserved errors, an appellant has no burden to obtain relief on appeal. *See United States v. Washington*, 57 M.J. 394, 399-400 (2002). Theoretically, the judges on this court should identify and grant relief regardless of the arguments of the parties.[17] For example, in *United States v. Grostefon*, our superior court relied on our broad review when deciding that seminal case:

> There can be little harm in [raising *Grostefon* issues] since the Court of Military Review has the mandatory responsibility to read the entire record and independently arrive at a decision that the findings and sentence are correct in law and fact. Hence, raising an issue that counsel does not think is meritorious would, at worst,

---

[16] My analysis here is limited to claims of IAC based on evidence not in the record of trial.

[17] To be clear, the parties' adversarial perspective often provides different insight, identifies issues that we might have missed, and benefits us greatly. As our superior court stated, "we must also recognize that even the most conscientious counsel and judges will occasionally overlook an error in the press of dealing with a load of case[s], and, for that reason, any assistance in the identification of issues can further the proper administration of military justice." *Grostefon*, 12 MJ at 436 (1982).

> signal the Court of Military Review to consider the record
> in light of that issue.

12 M.J. at 435 (1982).

A cheerful view of our Article 66(c) responsibilities is that the judges on this court attempt to get to the legally and factually correct result notwithstanding how an issue might be briefed. But, that logic applies only to our review of the record of trial. We do not conduct a de novo review of matter that is not part of the record of trial – if such a thing is even possible. Nor does our factfinding authority extend to matter outside the record. *United States v. Ginn*, 47 M.J. 236, 242-43 (1997).

In other words, the practical burden of proof on an appellant is entirely different depending on whether the factual basis for a claim is based on evidence inside or outside the record of trial. An appellant who seeks relief because of preserved instructional error should do their best to convince us they are entitled to relief. But, a failure to connect the dots in an appellate brief will not be fatal to our de novo review of the claim. By contrast, an appellant who seeks relief while relying on facts that are not in the record will fail if the facts are not presented in a manner the court can accept. *United States v. Cade*, 75 M.J. 923, 929-30 (Army Ct. Crim. App. 2016).

For emphasis, consider a more cynical framing. Under Article 66(c), our review includes a determination as to whether the findings are correct in law. In the case of an IAC claim, whether a finding is correct in law will not be determined by whether counsel were ineffective in the abstract, or whether a counsel is ineffective if only the true facts were to be discovered. This court is an appellate tribunal not an investigative body. Rather, a finding will only be incorrect in law if an appellant presents the facts to meet his burden under *Strickland*, 466 U.S. 668 (1984).

At several instances, appellant claims that his trial attorney was "most egregious[ly]" ineffective for failing to provide the court-martial with certain testimony and evidence. But, if this was error, it was an error that is repeated on appeal. And because we too are not provided with the allegedly key testimony and evidence, it is an error that is likely fatal.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

21